[No. B004367. Second Dist., Div. Four. Apr. 16, 1985.]

ELMER SPRAGUE, Plaintiff and Appellant, v.
EQUIFAX, INC., et al., Defendants and Appellants.

1018

---

---

## COUNSEL

G. Dana Hobart and Leonard Sacks for Plaintiff and Appellant.

Cosgrove, Cramer, Rindge & Barnum, J. D. Barnum and L. P. McElhaney for Defendants and Appellants.

---

## OPINION

**ARGUELLES, J.**—Defendants and appellants, Equifax, Inc. and Equifax Services, Inc. (appellants) have appealed from the judgment on special verdict entered after a two-and-one-half-month jury trial, finding that they engaged in a conspiracy to fraudulently deny insurance benefits to plaintiff and cross-appellant, Elmer Sprague (plaintiff), and awarding plaintiff $100,000 in compensatory damages and $5 million in punitive damages. Plaintiff has cross-appealed from the order granting a new trial as to punitive damages unless plaintiff consents to a reduction of those damages from $5 million to $1 million.

We affirm on both the appeal and cross-appeal.

### FACTS

The following were original defendants in this action:

Maccabees Mutual Life Insurance Company (Maccabees) was the insurer from which plaintiff obtained a policy of credit disability insurance.

TOP National Credit Union Service Company (TOP) was Maccabees' insurance claims adjuster.

Appellant Equifax, Inc. was a holding company with various subsidiaries, including appellant Equifax Services, Inc. Equifax, Inc. provided accounting, managerial, and legal services, as needed. Equifax Services, Inc. pro-

vided services to insurance companies and claims adjusters, which included investigating insurance claims and insurability of applicants and arranging medical examinations of claimants.

Charles Roath was the employee of appellants who, at TOP's request, scheduled a medical examination of plaintiff and selected the doctor for the examination.

Dr. Ernest Ramey was the physician selected by appellants to conduct a medical examination of plaintiff.

Before trial, plaintiff settled with defendants Maccabees and TOP for $375,000. During jury voir dire, plaintiff settled with Dr. Ramey for $5,000.

The events which led to this lawsuit were as follows:

In May 1975, plaintiff borrowed $21,687 from his credit union, pledging his savings as security for repayment of the loan, and naming the credit union as beneficiary of a credit disability insurance policy issued by Maccabees. Plaintiff, who was born in 1916, was 59 years old when he obtained the disability policy from Maccabees and 66 years old at the time of trial.

When he took out the policy, he was employed as a truck driver by Signal Trucking Service. He had limited formal education, having left high school in his last year to join the "CCC." He worked briefly repairing used cars for sale, then went to work for Signal Trucking Service.

His final assignment was making deliveries of appliances for Sears, which required loading his truck every morning with items to be delivered. On May 31, 1975, as plaintiff and his helper were lifting a dryer onto the top of a washer which they previously had loaded on the truck, plaintiff fell and injured his back. Plaintiff never returned to work after that.

Plaintiff was first treated at the Soto Industrial Clinic, where Dr. Munro found that plaintiff had a herniated disc. In September 1975, plaintiff's workers' compensation insurer had plaintiff examined by Dr. William Nelson, an orthopedic specialist, who received the reports from the Soto clinic. Plaintiff underwent several diagnostic tests, and several sets of X-rays were taken of his spine. In November 1975, he was admitted to a hospital and given a myelogram, to determine the exact condition of his spine.

After this testing, Dr. Nelson also concluded that plaintiff had a herniated disc and was totally disabled. Plaintiff was also examined by three other

doctors, and, in addition, information about his medical reports and tests was available from the records of his workers' compensation hearing.

Plaintiff's credit disability policy issued by Maccabees provided for payment of up to $250 per month of his loan payments in case of total disability, and defined "total disability" as follows: ". . . that condition resulting from injury or sickness, which prevents the insured debtor *during the first 18 months* from performing *every* duty of his occupation or employment and during any period *over 18 months,* from performing *any gainful occupation* for which he is reasonably suited by reason of *education, training or experience,* and for which evidence of such total disability is provided by the debtor at reasonable intervals as may be required by the Company." (Italics added.)

The policy also provided the insurance company had the right to have physicians designated by it examine any person making a claim for benefits "when it may reasonably require."

For the first 18 months after the accident, plaintiff furnished medical reports showing his disability, and Maccabees continued to make payments on plaintiff's loan. On May 19, 1976, TOP advised plaintiff that he no longer needed to submit regular medical reports.

However, TOP later changed its claims policy. The deposition of Paul Namel, a former claims manager for TOP, provided evidence that, in the fall of 1976, TOP changed from a policy of processing disability claims as quickly as possible, to assure that credit unions would minimize their delinquency rates on loans, to a "get tough" attitude. After the "get tough" policy was instituted, Mr. Namel was instructed to terminate benefits automatically after 18 months, on the theory that a certain percentage of claimants would be disabled from performing their regular occupation, but would not be disabled from performing other work, so that they would not be entitled to benefits after the first 18 months. Only if a claimant objected to the termination of benefits would the case be handled by an individual review.

After the "get tough" claims policy was implemented, there was also a change in the interpretation by TOP of the meaning of "disabled" after the first 18 months. Before then, "gainful employment" would be employment bringing in about as much as the claimant had made before. After that time, TOP considered that it meant employment bringing in any amount, no matter how small.

TOP frequently ordered medical examinations after it adopted its tough claims policy, but had seldom done so before then.

By letter of December 9, 1976, Mr. Namel informed plaintiff that benefits were being terminated because under the definition of disability applicable after 18 months, plaintiff was no longer disabled. Plaintiff informed his workers' compensation lawyer, who wrote to TOP demanding continuation of benefits, and stating, "I do not understand what gainful employment Mr. Sprague can do."

Mr. Namel then reviewed plaintiff's file and concluded that he had been diagnosed as having a herniated disc and could not return to work. On February 14, 1977, Mr. Namel wrote to plaintiff and his attorney, stating that payments had been terminated in error and were being reinstated.

Believing that the information then available to TOP would not support terminating plaintiff's benefits, Mr. Namel prepared a memorandum to Loretta Ballard, a claims supervisor at TOP, which stated, in relevant part, as follows: "Loretta, please reinstate payment from 11/30/76 to 2/12/77. Payment for this period is certainly questionable. However, since we put the member on short form and then arbitrarily cut off benefits, let's complete the following: [¶] Require monthly medical reports. Obtain immediate activity check. Cite claimant to doctor for independent medical exam. (Can claimant RTW [return to work] as cab driver, night watchman, et cetera? Loan expires in 1980. You should be putting the facts together to terminate on a sound basis!)"

An "activity check" meant that TOP would have an investigator perform a surveillance of plaintiff in his neighborhood in order to discover if he was in fact, disabled. Appellants never produced the results of any activity check of plaintiff.

Loretta Ballard telephoned appellants' office nearest plaintiff to arrange a medical examination pursuant to Mr. Namel's instructions. The order was placed with appellants' employee, Marietta Wilhoit.

On April 26, 1977, Mr. Roath, a field representative for appellants in the Los Angeles area, received the request to arrange a medical examination of plaintiff. Plaintiff testified that Mr. Roath telephoned to inform him that TOP wanted the examination. Plaintiff felt the examination would be a "set up," but Mr. Roath assured him that it would be fair and impartial. Plaintiff told him that the examination should not be necessary because he had been examined so many times before, but Mr. Roath told him that if he did not go for the examination, his benefits would be terminated. Mr. Roath did not recall this conversation, nor did he keep any notes.

Mr. Roath selected Dr. Ramey for the examination. Appellants had used Dr. Ramey for many such examinations, including 125 examinations in the

1-year period before plaintiff was examined, and Mr. Roath himself used Dr. Ramey for many of the medical examinations he arranged. Most of Dr. Ramey's practice consisted of examining claimants on behalf of insurance companies.

Dr. Ramey diagnosed the majority of back injury claimants he examined as having lumbosacral strains, rather than herniated discs, even though many of them had the signs and symptoms of herniated discs. A herniated disc is a much more serious condition than a lumbosacral strain, and is much more likely to lead to disability.

Appellants did not ask that claimants' medical records be sent to the examining doctor unless the doctor requested them, and Mr. Roath did not remember Dr. Ramey ever requesting them. Dr. Ramey did not request, and appellants did not provide, any information on claimants' previous medical histories, tests, or examinations, or any guidelines on what would constitute disability under the particular insurance policy involved.

In plaintiff's case, Dr. Ramey had no information other than what was in a letter from Mr. Roath and what plaintiff told him at the examination.

Mr. Roath's letter of April 27, 1977, to Dr. Ramey regarding plaintiff's examination read as follows: "I am representing TOP, Inc. They have asked that I have you examine one of their insured's [sic] who is currently on disability. Mr. Sprague has been disabled since 5-31-75 due to a back problem. *We do not know the exact nature of his problem.* In your examination, please determine whether or not you would consider him to be totally and permanently disabled from any and all occupations for which he might reasonably be fitted. . . ." (Italics added.)

In fact, TOP had not told Mr. Roath that they did not know the nature of plaintiff's problem, and Mr. Roath did not request more information. Mr. Roath also did not inquire what definition of disability applied to plaintiff under the insurance policy, and did not inform Dr. Ramey that under California law, plaintiff would still be deemed disabled unless he could perform "the substantial and material acts necessary to . . . a business or occupation in the usual or customary way," (*McMackin* v. *Great American Reserve Ins. Co.* (1971) 22 Cal.App.3d 428, 437 [99 Cal.Rptr. 227]) or that he would still be disabled even if he could perform sporadic tasks (*Erreca* v. *West. States Life Ins. Co.* (1942) 19 Cal.2d 388 [121 P.2d 689, 141 A.L.R. 68]).

Although TOP's written requests for a medical examination would normally have been sent to appellants, copied in their offices, and passed along

to appellants' employee, who would arrange the examination, neither appellants nor TOP produced a copy of any written request for plaintiff's examination, and appellants did not explain its absence. Appellants also did not produce a copy of an "office made inquiry," a document which they normally would have prepared when a request was made orally. A vice president of appellants testified that when he looked in his medical examination file in response to an order to produce, he found it empty.

On April 27, 1977, in a letter to TOP, Mr. Roath wrote that he had arranged an independent medical examination with Dr. Ramey, and said, "We have used Dr. Ramey many times in the past and have found him to be very satisfactory."

Plaintiff reported promptly for the examination, as scheduled, on May 6, 1977, had X-rays taken of his back, and was given "one of the fastest examinations I ever had in my life," by Dr. Ramey. Plaintiff estimated that the examination lasted about 10 minutes. Dr. Ramey did not inquire about plaintiff's previous tests and examinations. The speed of the examination convinced plaintiff that his original feeling had been right, that the examination was a "set-up."

Dr. Ramey's report, dated May 6, 1977, the same day as the examination, concluded that plaintiff was suffering from a lumbosacral strain and degenerative arthritis and should be restricted to "light work, . . . with a minimum of . . . physical effort . . . ." On May 12, TOP cut off benefits as of May 7, based on the report.

Mr. Namel testified that he was told by his supervisor at TOP that the purpose of a claims department was not to find ways to pay claims, but to find ways to deny claims. Thus, based on Dr. Ramey's report, he felt that there was sufficient information to deny plaintiff's claim, and that it was unnecessary to consider any other information.

When TOP terminated plaintiff's benefits on the ground that he might be suited to pursue an occupation other than the one in which he was engaged at the time of the accident, Mr. Namel had no information in his possession which would show any other occupations, or training, of plaintiff. Mr. Namel admitted that there was nothing in the files to indicate that plaintiff could actually be a night watchman, cab driver, or dispatcher, although it was a general belief among his supervisors that anyone could engage in one of those occupations.

Mr. Namel was of the opinion that, when performing an independent medical examination, the physician should have the prior medical records

of the claimant, as well as a detailed description of the claimant's job. However, appellants never asked for additional medical records or other information when arranging a medical examination at TOP's request. Mr. Namel had the impression while he worked at TOP that medical examinations were being scheduled just to verify the denial of claims. When he requested that appellants set up an examination, he believed that they would select a defense oriented doctor to perform the examination.

Plaintiff showed that appellants' business consisted of providing credit reports, investigations and similar services to insurance companies and other businesses, through a network of local offices around the country. The service which TOP used in this case was called an "independent medical examination" service. Appellants described this service, in sales literature aimed at insurance company customers, as providing an "impartial" medical examination, by a "disinterested" doctor. However, the sales literature also emphasized that these medical examinations were "a necessary and important procedure in disability claim, examination and control," particularly with long-term disability claims.

The literature also informed insurance companies that appellants "work regularly with doctors and keep availability open," and that written reports were made "promptly after exam completed." Appellants represented that the cost of their independent medical examination service was justified by savings to the insurance companies, partially as a result of terminating disability benefits, including credit disability insurance benefits in cases like plaintiff's.

The sales literature contained testimonials from insurance companies that had been able to terminate disability benefits on the basis of appellants' medical examination service, but none in which claims had been continued. In fact, appellants' employees were instructed to select doctors who would "give the insurance company most value for its money," and to obtain local physicians' names from insurance claims agents. Plaintiff introduced evidence of instances in which appellants recommended for further use doctors who had produced information leading to termination of disability benefits.

When arranging medical examinations, appellants normally did not secure claimants' previous medical records or reports, but used only the information supplied by the insurance company. They also did not inform their personnel, or their examining physicians, about the definitions of disability in the various insurance policies.

Plaintiff tried the case partially on the theory that appellants conspired with TOP and Maccabees to fraudulently terminate plaintiff's benefits, and partially on a fraud theory. The jury found the existence of a conspiracy.

CONTENTIONS ON APPEAL

Appellants adopt each other's contentions and statements of facts on appeal and contend that: (1) The evidence was insufficient to establish that they had knowledge of a plan to fraudulently deny plaintiff's insurance benefits; and (2) the jury was erroneously allowed to consider plaintiff's claim that he continued to suffer mental distress even after his disability insurance benefits were conditionally restored.

Appellants make the following contentions regarding evidentiary rulings: (3) Evidence of appellants' "habit" or "custom" of dealing with insurance claimants was erroneously admitted; (4) plaintiff's deposition testimony and an interrogatory answer were erroneously admitted; (5) TOP's claims file and the deposition testimony of Mr. Namel were erroneously admitted; (6) the testimony of Dr. Redden as a medical expert witness was erroneously excluded; and (7) the deposition of Loretta Ballard was erroneously excluded.

They also make the following contentions regarding jury instructions: (8) The jury instructions on conspiracy were inadequate on the issue of appellants' knowledge of the conspiracy, and were argumentative, inconsistent, repetitious, vague, and unduly emphasized the conspiracy theory of the case; (9) six listed jury instructions were improperly refused by the court; and (10) BAJI Nos. 2.02 and 2.03, on suppression of evidence in the possession of a party, and failure to produce better evidence, were erroneously given.

CONTENTIONS ON CROSS-APPEAL

Plaintiff contends on cross-appeal that the trial court's order reducing the amount of punitive damages was in error.

DISCUSSION

THE APPEAL

I. *Sufficiency of the Evidence of Knowledge of the Conspiracy*

Appellants contend that the testimony of Mr. Roath, Mr. Namel and Loretta Ballard (which appellants claim was erroneously excluded) should have established that, as a matter of law, appellants lacked the required knowledge of TOP's plan to terminate plaintiff's disability benefits.

When the appellant attacks the judgment on the ground that the evidence is insufficient to support the verdict, the appellant is required to set

forth in its brief all the material evidence on the subject and not merely evidence which it believes supports its contention, or the claim of error will be deemed to be waived. (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362]; *Estate of D'India* (1976) 63 Cal.App.3d 942, 950 [134 Cal.Rptr. 165].)

In their brief on this appeal, appellants have cited only segments of the evidence which they consider favorable. This court could dismiss appellants' contention on that basis. However, this contention fails for two other reasons, as well.

■ First, the jury is not required to believe the testimony of any witness, even if uncontradicted. " '[T]he jury properly may reject part of the testimony of a witness, though not directly contradicted, and combine the accepted portions with bits of testimony or inferences from the testimony of other witnesses thus weaving a cloth of truth out of selected available material. [Citations.]' " (*Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 67-68 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059].) Thus, the jury was not required to believe the testimony of Mr. Roath or Mr. Namel, insofar as it was favorable to appellants, nor would it have been required to believe the deposition testimony of Loretta Ballard, had it been admitted.

■ Second, in accordance with established principles of appellate review, we must presume on appeal that the jury found disputed issues of fact in favor of the prevailing party at trial, and we must indulge every reasonable inference from the evidence to support the verdict. (See *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) ■ Thus considered, there was substantial evidence to support the verdict, and that appellants had knowledge of the fraudulent scheme to terminate plaintiff's benefits.

In holding that evidence was sufficient to support a finding of conspiracy, this state's Supreme Court has held that, "a plaintiff is entitled to damages from those defendants who concurred in the tortious scheme with knowledge of its unlawful purpose. [Citation.] Furthermore, the requisite concurrence and knowledge ' " ' "may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances.' " ' [Citation.] Tacit consent as well as express approval will suffice to hold a person liable as a coconspirator. [Citation.]" (*Wyatt* v. *Union Mortgage Co.* (1979) 24 Cal.3d 773, 784-785 [157 Cal.Rptr. 392, 598 P.2d 45].)

Here, plaintiff presented evidence from which the jury could reasonably infer that appellants conspired with TOP to arrange an inadequate medical

examination, producing a false conclusion, which would form an apparently plausible basis for wrongfully terminating payments. Appellants appealed to insurance companies with the idea that appellants could enable the insurance companies to do indirectly what they could not do directly, that is, to terminate disability insurance benefits without adequate cause. From appellants' promotional literature, their relationship with TOP and Dr. Ramey and their course of conduct towards plaintiff, the jury must be deemed to have reasonably inferred that appellants had knowledge that TOP's purpose in requesting a medical examination was to fraudulently terminate plaintiff's benefits, and acted to ensure that result.

We find that the evidence was sufficient to support an inference of the requisite knowledge on appellants' part, and, accordingly, that there was substantial evidence to support the jury verdict.

II. *Plaintiff's Continuing Mental Distress After Conditional Restoration of Benefits*

■ Appellants contend that it was reversible error to allow the jury to consider, as an element of damages, plaintiff's mental distress after TOP conditionally restored his insurance benefits in March 1978.

After receipt of Dr. Ramey's medical report, TOP terminated plaintiff's benefits and made no payments until March 1978. Appellants do not contend that an award of damages for emotional distress during that period was improper.

However, by letter of March 3, 1978, TOP's attorney informed plaintiff's counsel that TOP had sent a check to plaintiff's credit union to cover missed payments and interest, and that Maccabees would resume monthly payments.

The letter further read as follows: "These payments are not to be construed in any way as an admission that Mr. Sprague is, in fact, entitled to benefits under the policy or that he is, in fact, suffering financially or emotionally. [¶] Rather, our clients merely wish to ensure that Mr. Sprague does not suffer undue hardship during the pendency of this litigation."

Plaintiff testified that his worry and mental distress continued until June 1982, when Maccabees and TOP finally settled with him, thus removing the possibility that he would be required to repay them.

Appellants contend that, after the letter of March 3, 1978, their liability ceased for compensatory damages for emotional distress, because plaintiff

cannot show substantial damages apart from those due to mental distress after that date.

An award of damages for emotional distress resulting from tortious termination of disability insurance benefits is not limited as a matter of law to the time during which the economic harm continues totally unabated. Those cases which have allowed emotional distress as an element of damages resulting from tortious breach of insurance contracts have required economic harm only to ensure, as a threshold matter, that an actual wrong has been committed against plaintiff.

"The general rule of damages in tort is that the injured party may recover for *all detriment caused* . . . . (Civ. Code, § 3333; [citation].) In accordance with the general rule, it is settled in this state that mental suffering constitutes *an aggravation of damages when it naturally ensues from the act complained of* . . . . [D]amages for mental distress have . . . been awarded in cases where the tortious conduct was an interference with property rights without any personal injuries apart from the mental distress. [Citations.] [¶] We are satisfied that a plaintiff who as a result of a defendant's tortious conduct loses his property and suffers mental distress may recover not only for the pecuniary loss but also for his mental distress. . . . *The principal reason for limiting recovery of damages for mental distress* is that to permit recovery of such damages would open the door to fictitious claims, to recovery for mere bad manners . . . . [Citation.] Obviously, where, as here, the claim is actionable and has resulted in *substantial damages* apart from those due to mental distress, *the danger of fictitious claims is reduced,* and we are not here concerned with mere bad manners or trivialities but tortious conduct resulting in substantial invasions of clearly protected interests.[4] [Fn. 4:] Nor are we here concerned with the problem whether invasion of the plaintiff's right to be free from emotional disturbance is actionable where there is no injury to person or property rights in addition to the inflicted mental distress. [Citation.]" (*Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425, 433-434 [58 Cal.Rptr. 13, 426 P.2d 173]; italics added.)

In *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566 [108 Cal.Rptr. 480, 510 P.2d 1032], the court held that where plaintiff alleged that he suffered economic losses apart from mental distress, plaintiff could recover for mental distress as an element of damages for tortious breach of an insurer's duty of good faith and fair dealing. The economic loss ensured that plaintiff had stated a cause of action for tortious breach of the insurer's duty, and prevented the recovery of damages for emotional distress from being subject to the more stringent requirements (for extreme and outrageous conduct) for the independent tort of intentional infliction of emotional distress. (At pp. 579-581.)

Within the guidelines set forth in *Crisci* and *Gruenberg,* plaintiff was entitled to recover for his continuing mental suffering. The threshold requirement of economic loss was satisfied when appellants initially participated in fraudulently terminating his benefits. From then on, plaintiff was entitled to recover damages for his mental suffering proximately caused by the termination of benefits, for whatever length of time his mental suffering continued. (See Civ. Code, § 3333; *Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d at p. 433.)

After the threshold showing of economic harm was made, evidence that TOP and Maccabees conditionally restored plaintiff's benefits went only to the quantity of damages, and the credibility of plaintiff's claim that he continued to suffer emotional distress, which were matters for the jury, and not to be reweighed on appeal. (See *Pistorius* v. *Prudential Insurance Co.* (1981) 123 Cal.App.3d 541, 552 [176 Cal.Rptr. 660].)

Once plaintiff suffers an economic loss, worry in anticipation of future proceedings necessary to determine plaintiff's rights may give rise to damages for emotional distress.

Moreover, decisional authority supports the continuation of damages for mental distress where, as here, compensation for an economic loss is not finally settled. In *Fleming* v. *Safeco Insurance Co.* (1984) 160 Cal.App.3d 31, 38-39 [206 Cal.Rptr. 313], this court held that there was substantial evidence to support an award of compensatory damages for emotional distress as a result of an insurer's wrongful failure to settle, where plaintiff suffered worry and anxiety as a result of anticipating an arbitration hearing.

Moreover, plaintiff was damaged economically by the continuing possibility of having to repay Maccabees. A debt is as much an economic loss as the removal of payments, particularly where the debtor is disabled and without income to make repayment. (See, e.g., *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 397-398 [89 Cal.Rptr. 78, 47 A.L.R.2d 286].)

In *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 819 [169 Cal.Rptr. 691, 620 P.2d 141], the Supreme Court, in upholding an award of damages against an insurer for wrongful termination of disability insurance benefits, said, "the major motivation for obtaining disability insurance is to provide funds during periods when the ordinary source of the insured's income—his earnings—has stopped. The purchase of such insurance provides peace of mind and security in the event the insured is unable to work. [Citation.] To protect these interests it is essential that an insurer fully inquire into possible bases that might support the insured's claim. . . ."

Plaintiff, a person of moderate means near retirement age, with little education which would lead to new employment, became totally disabled. His credit disability policy had been obtained to provide peace of mind about repayment of his loan from the credit union in just such an event. Payment of benefits conditionally would not restore plaintiff's peace of mind, and the jury was entitled to consider the evidence.

■ Appellants assert that they were shielded by TOP's privilege to assert its rights, but this contention must fail because an assertion of an insurer's rights is privileged only if there is a good faith belief in the existence of the right asserted. (*Fletcher* v. *Western National Life Ins. Co.*, *supra*, 10 Cal.App.3d 376, 395.) "Settlement implies the existence of a good faith dispute, and there is no public policy in favor of an attempt to coerce settlement of a nonexistent dispute by outrageous means." (*Id.*, at p. 396.) As there was no good faith belief that plaintiff was not entitled to benefits, TOP was not privileged to make payments to plaintiff conditionally, and appellants were not shielded by privilege from damages for that period of time.

■ Appellants further complain that the trial court refused their requested instruction that: "[W]ithout economic hardship of any kind, there can be no . . . [recovery for] emotional distress." This instruction misstates the law. The term "economic hardship" is unduly restrictive, because the showing plaintiff must make is of economic loss, which does not necessarily entail "hardship."

■ Appellants contend that it was error for the court to refuse to submit to the jury their special interrogatory on whether their conduct was a "legal cause" of plaintiff's emotional distress from March 1978 through June 1982. A finding of error on this issue requires a showing that the court abused its discretion in refusing this special interrogatory. (See *Pigeon* v. *Fuller* (1909) 156 Cal. 691, 696 [105 P. 976].) We find no such abuse of discretion. The jury was instructed adequately on the law governing liability. Also, in requesting a finding as to "legal cause," the refused interrogatory improperly requested the jury to reach a conclusion of law. (See *Petersen* v. *California C. Mills Co.* (1912) 20 Cal.App. 751, 762 [130 P. 169].)

III. *Evidence of Appellants' Business Practices Was Properly Admitted ("Habit" and "Custom")*

■ Appellants contend that they were prejudiced by the trial court's erroneous admission of evidence of their business practices prior to denial of plaintiff's claim. They characterize this as evidence of "habit" and "custom." (See Evid. Code, § 1105.) They also contend that this evidence was

improperly admitted because its prejudicial effect outweighed its probative value.

The testimony of which appellants complain was given by Russell Beckett, a regional vice president of appellants; Eugene Hayes, a regional quality control specialist; and Thomas Hennecke, a division sales manager. Most of these witnesses' testimony concerned appellants' business practice of obtaining for insurance companies adverse information about insureds other than plaintiff.

The testimony was admitted as relevant to the meaning of several notations in Mr. Roath's personnel file, which included a memorandum dated about three months after he handled plaintiff's medical examination. The memo recommended that Mr. Roath receive a salary increase because he was doing better than average in the "quality of his work." Other documents in the file stated that "quality" of work would be the primary basis on which claims personnel would be evaluated for merit increases. Mr. Roath testified that he was trained by appellants to "influence the quality of the reports" produced by the group that he supervised.

Plaintiff introduced the testimony to show that appellants defined "quality" to mean work results adverse to insurance claimants. Plaintiff also showed that appellants evaluated the "quality" of their employees' work in arranging medical examinations for disability claimants.

Appellants denied that "quality" audits of medical examinations took place.

The law governing admission of this evidence is as follows: "(a) *Except as provided* . . ., evidence of a person's character or a trait of his character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his conduct) is inadmissible when offered to prove his conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, *or other act* when relevant to prove some fact (such as *motive, opportunity, intent, preparation, plan, knowledge,* identity, or *absence of mistake or accident*) other than his disposition to commit such acts." (Evid. Code, § 1101; italics added.)

In *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 922-923, and footnotes 6 and 8 [148 Cal.Rptr. 389, 582 P.2d 980], evidence of an insurance company's policy on settlement of claims, in the form of a claims representative field manual which described claims procedures was used to

show the insurance company's intent and that the company engaged in a conscious course of conduct towards plaintiffs.

In *Pistorius* v. *Prudential Insurance Co., supra,* 123 Cal.App.3d 541, 556-557, and footnote 10, the court rejected an insurance company's contention that Evidence Code section 1101, subdivision (a), prohibited admitting evidence of episodes of cutting off disability benefits to see if insureds would complain, consistent with the company's longstanding policy. The court held that under subdivision (b) of section 1101, this evidence was admissible to show motive, opportunity, intent, plan, knowledge and the like, in terminating plaintiff's benefits.

In the present case, the evidence was relevant to show company motives in arranging for medical examinations of disabled insureds, and also was relevant to the issues of intent, motive, knowledge, and plan, relevant to the conspiracy alleged by plaintiff to fraudulently terminate his benefits.

The trial court must be upheld in determining not to exclude this evidence pursuant to Evidence Code section 352, which provides that relevant evidence must be excluded if its prejudicial effect outweighs its probative value. In a case based on inferential evidence of conspiracy, the meanings of terms used by one of the alleged conspirators in its internal files was highly relevant. The prejudicial effect would have been in showing the jury that appellants were companies dedicated to "serving" the insurance industry by locating and revealing information which could be adverse to insureds and could help insurers in declining to insure or denying or terminating insurance benefits. As there was other information which established the nature of appellants' business more directly, this particular evidence was not unduly prejudicial.

As the trial court announced in ruling on the motion, "The motive of the office person . . . who selected Dr. Ramey . . . is put in issue in this case. The selector is Mr. Roath. His motive can be examined only circumstantially in the context of company policy including factors such as inducement, reward, review or criticism. [¶] [L]atitude in exploring . . . this . . . is reasonable . . . . [¶] I believe that this can be developed probatively without being outweighed by the policy grounds under 352. [¶] Whether these kinds of quality assessments made by the supervisors or the field reps affected decision making in Roath's selection of Dr. Ramey can fairly be weighed by the jury together with all other evidence as it likewise can be explained in the context of corporate policy by the defendants."

IV. *Plaintiff's Deposition Testimony and Interrogatory Answer No. 238*

 Appellants contend that part of plaintiff's deposition testimony and one interrogatory answer were erroneously admitted, creating prejudicial error. This contention is without merit.

Appellants themselves introduced part of plaintiff's deposition in which plaintiff testified that Mr. Roath called and told him to go to the medical examination, introduced himself as an "insurance fellow that was assigned to the case"; and said that appellants had "brought the case locally to Long Beach instead of sending it back East or wherever their main office was." Appellants' counsel sought to limit the testimony introduced to this part of the conversation. The deposition testimony which plaintiff offered in rebuttal contained plaintiff's testimony about the remainder of that conversation, in which Mr. Roath told him that he must take the medical examination or have his benefits terminated, and that Dr. Ramey would give him a fair and impartial examination.

The interrogatory answer was as follows: ". . . that [Mr. Roath telephoned plaintiff and] identified himself as a representative of Maccabees. That plaintiff was required to submit to examinations when requested. That if he did not attend, his benefits would be terminated immediately. That Dr. Ramey was a prominent orthopedic specialist. That Ramey would be fair and objective in giving his opinions to the insurance company. . . . That plaintiff should cooperate fully with Dr. Ramey as it was to plaintiff's advantage to do so in order that Ramey's report would be complete. Where Ramey was located. That plaintiff would be notified as to the date and time. [¶] [And that plaintiff] did not understand the need for an examination in light of his serious physical condition. That his doctors uniformly felt his disc injury made him totally disabled."

The court admitted this evidence pursuant to Evidence Code section 356, and found that its prejudicial effect did not outweigh its probative value pursuant to Evidence Code section 352.

Evidence Code section 356 provides as follows: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; . . . and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

The remainder of a conversation is admissible under Evidence Code section 356 "if it has ' "some bearing upon, or connection with, the admission or declaration in evidence . . . ." ' [Citations.]" (*Carson* v. *Facilities Development Co.* (1984) 36 Cal.3d 830, 850 [206 Cal.Rptr. 136, 686 P.2d 656].) However, admission of the rest of a statement is limited to those parts relevant to or necessary for an understanding of the part already admitted. (See *MaGee* v. *Wyeth Laboratories, Inc.* (1963) 214 Cal.App.2d 340, 355 [29 Cal.Rptr. 322].)

Admission of the deposition testimony offered by appellants without the part then offered by plaintiff would have been unduly confusing to the jury, as it would have falsely implied that plaintiff testified at his deposition that Mr. Roath said only whom he represented, and that plaintiff was to report for a medical examination. Therefore, the trial court did not abuse its discretion in admitting the further testimony of plaintiff regarding the remainder of the conversation between plaintiff and Mr. Roath, pursuant to Evidence Code section 356.

 Also, both the deposition testimony and the interrogatory answer were properly admitted as prior consistent statements.

Evidence Code section 791 provides as follows: "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; . . ."

Subdivision (a) is not limited to situations in which there have been charges of recent fabrication, but extends to any situation in which a witness is impeached with an inconsistent statement. To be admissible, the prior consistent statement only need be earlier in time than the inconsistent statement. (See Witkin, Cal. Evidence (2d ed. 1966) § 1281, p. 1185.)

Appellants introduced statements by plaintiff that he did not recall parts of his conversation with Mr. Roath. The interrogatory answer and deposition testimony met the requirements of section 791 as they were prior consistent statements made before the seemingly inconsistent statement which appellants introduced at trial.

### V. *TOP's Claims File and Mr. Namel's Deposition*

 Appellants contend that it was prejudicial error to admit into evidence documents from TOP's claims file on plaintiff's case and the deposition of Mr. Namel. Appellants object to this evidence on the ground that it was irrelevant.

The testimony of Mr. Namel has been set forth above. The claims file contained some notes memorializing Ms. Ballard's telephone contacts with appellants' employees, Marietta Wilhoit and Mr. Roath.

Appellants objected that this evidence went to TOP's termination of plaintiff's benefits before appellants became involved, but the trial court found

that there was a sufficient connection between the earlier termination of plaintiff's benefits and TOP's contacting appellants, to make the evidence admissible as part of the proof of conspiracy, because the earlier termination of benefits explained TOP's motive in bringing in appellants, and explained Mr. Namel's memorandum regarding finding a sound basis for termination.

In *People* v. *Calhoun* (1958) 50 Cal.2d 137, 144 [323 P.2d 427], the court held that in a prosecution for conspiracy, evidence of acts which occurred before formation of the conspiracy was admissible as long as it had some bearing on the ultimate issue of the existence and purpose of the conspiracy.

The court did not abuse its discretion in admitting this evidence to show the motivation and purpose of the conspiracy, and the fact that the purpose originated with TOP before appellants were involved does not render this evidence inadmissible.

### VI. *The Expert Medical Testimony of Dr. Redden*

Appellants contend that the trial court improperly denied leave to call, as an expert medical witness, Dr. Thomas A. Redden, an expert in orthopedic surgery, and that his testimony was needed to show that Dr. Ramey's conclusions were justified and that bias could not be inferred from the frequency with which Dr. Ramey found that claimants could return to work.

Appellants were the only ones of the original defendants from whom plaintiff requested a designation of expert witnesses. (TOP and Maccabees settled before trial, and plaintiff may have anticipated settling with Dr. Ramey.)

In their designation, appellants represented that, with the exception of Dr. John L. Howard, their physician experts had examined or treated plaintiff and would be called to testify regarding plaintiff's condition, and that Dr. Howard had examined plaintiff in preparation for trial and would testify to his condition on the date of that examination. Dr. Redden was not designated as an expert witness to be called by appellants.

On October 25, 1982, plaintiff announced during jury voir dire that he had settled with Dr. Ramey. When the settlement was announced, appellants' counsel said, "[W]e've had a great deal of discussion, of course, about 89 medical reports that may or may not be used during the course of this trial. [¶] Now, *certain* approaches and responsibilities were undertaken by the various defendants with respect to meeting *certain* portions of the

case. At this late date, the removal of Dr. Ramey as a defendant . . . does pose *certain* problems . . . ." (Italics added.)

Counsel did not specify then what these problems were, or what responsibilities had been undertaken by the other defendants.

The taking of evidence began on October 28, 1982. On Monday, November 22, 1982, appellants' counsel informed the court and plaintiff that, "Late last week, the determination was made, I for the first time had an opportunity to confer with Dr. Redden, and . . . he ought to be called as an expert on behalf of the defendants . . . ."

On December 9, 1982, appellants filed a written motion to be allowed to call Dr. Redden as an expert witness, on the ground that appellants could not, in the exercise of reasonable diligence, have determined to call Dr. Redden, based on the following allegations: Plaintiff never demanded that Dr. Ramey or TOP disclose its expert witnesses; before trial, counsel for all defendants agreed that counsel for Dr. Ramey would be responsible for presenting expert testimony on the accuracy and reasonableness of Dr. Ramey's medical reports; plaintiff's settlement with Dr. Ramey left appellants without expert testimony on the reasonableness of Dr. Ramey's medical reports; and when appellants' counsel learned that Dr. Ramey had intended to call Dr. Redden as an expert, counsel attempted to arrange with Dr. Redden to testify for appellants. Appellants also alleged that plaintiff could not complain about calling Dr. Redden as a witness, because plaintiff had never demanded designation of witnesses from Dr. Ramey.

The court denied appellants' motion to allow Dr. Redden's testimony on the ground that appellants had not made an adequate showing, given the events in trying the case. We must uphold the court's determination.

Code of Civil Procedure section 2037[1] et sequitur provide, in relevant part, that at least 70 days before trial, a party may serve on another party a demand for a list of expert witnesses and, on a date of exchange at least 20 days later, both parties must serve on each other their lists of expert witnesses. (§§ 2037-2037.2.) The list must include "a brief narrative statement of the qualifications of such witnesses and the general substance of the testimony which the witness is expected to give." (§ 2037.3.)

A party who has been required to exchange its list must *diligently* give notice to the other party if it later decides to call an expert witness not

[1]All references hereafter are to the Code of Civil Procedure, unless otherwise indicated.

named in its list, and must make the witness available for deposition. (§ 2037.4.)

Upon the objection of a party *who has served his list* in compliance with section 2037.2, a party may not call an expert witness not listed, and for whom the qualifications and substance of testimony have not been given, except for purposes of impeachment. (§ 2037.5.)

Section 2037.6 provides as follows: "(a) The court may, upon such terms as may be just . . ., permit a party to call a witness, . . . where such witness, is required to be, but is not, included in such party's list of expert witnesses so long as the court finds that such party has made a *good faith effort* to comply with Sections 2037 through 2037.3, inclusive, that he has complied with Section 2037.4, and that . . . he: [¶] (1) Would not in the exercise of *reasonable diligence* have determined to call such witness; or [¶] (2) Failed to determine to call such witness through mistake, inadvertence, surprise, or excusable neglect. [¶] (b) . . . [T]he court shall take into account the extent to which the opposing party has relied upon the list of expert witnesses and will be prejudiced if the witness is called." (Italics added.)

When a motion for relief from default on the basis of excusable neglect is tried on affidavits or other evidence, the trial court's determination of fact will be upheld if supported by substantial evidence. (*Outdoor Imports, Inc.* v. *Stanoff* (1970) 7 Cal.App.3d 518, 522 [86 Cal.Rptr. 593].) Additionally, whether to grant relief from failure to disclose an expert witness is addressed to the sound discretion of the trial court, and its decision will not be disturbed absent a showing of manifest abuse of that discretion. (*Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757, 782 [174 Cal.Rptr. 348].)

Under the standard set forth in section 2037.6, the court did not abuse its discretion in refusing to permit Dr. Redden to testify. The trial court found that appellants did not make a good faith effort to comply with sections 2037 through 2037.3, because they deliberately relied on Dr. Ramey to provide Dr. Redden's testimony, rather than listing him as their own witness. Appellants also did not show reasonable diligence, because trial counsel's vague statement about "certain problems," when Dr. Ramey's settlement was announced, was not reasonably calculated to disclose Dr. Redden's existence to the court, and appellants waited almost a month before finally getting specific about their "problems." Appellants' decision not to list Dr. Redden initially was not the result of neglect, excusable or otherwise, but was a deliberate tactical decision, which would have had the

effect, intended or not, of allowing appellants the benefit of his testimony without the necessity of disclosing what that testimony would be.

Dr. Redden also could not be called by appellants as an "impeachment" witness. ■■■■ Calling an expert witness to testify to an opinion *contrary* to the opinion of another expert witness is not "impeachment," within the meaning of section 2037.5. (*Collin* v. *Connecticut Valley Arms, Inc.* (1982) 137 Cal.App.3d 815, 821-822 [187 Cal.Rptr. 306]; disapproved on another ground in *Resch* v. *Volkswagen of American, Inc.* (1984) 36 Cal.3d 676, 682 [205 Cal.Rptr. 827, 685 P.2d 1178].)

■■■■ Appellants contend that plaintiff was not in compliance with section 2037.2, and thus, could not object to appellants' attempt to call Dr. Redden. (See § 2037.5.) Appellants do not contend that plaintiff did not list his experts, but, rather, that he did not provide a sufficient statement of the general substance of their testimony, as required by section 2037.3. We disagree.

A statement of the substance of the testimony is required for compliance with section 2037.2. In *West Hills Hospital* v. *Superior Court* (1979) 98 Cal.App.3d 656, 660 [159 Cal.Rptr. 645], the court held that compliance with section 2037.2 requires proper service of the witness list in compliance with section 2037.1.

■■■■ We hold that compliance with section 2037.2 requires inclusion of a statement of the general substance of the testimony, in compliance with section 2037.3. Service of a list not containing the required information cannot satisfy section 2037.2.

■■■■ However, plaintiff was in compliance with both sections. Section 2037.3 requires the party to disclose, either in his witness exchange list, or, in response to a request at the witness' deposition, the *substance* of the facts and opinions to which the witness will testify at trial (*Kennemur* v. *State of California* (1982) 133 Cal.App.3d 907, 919 [184 Cal.Rptr. 393].)

Plaintiff informed appellants that Dr. Nelson would testify "to the medical care and treatment rendered to plaintiff as well as [his] diagnoses and prognoses of plaintiff's physical condition."

Dr. Nelson testified that he had examined plaintiff at the request of the workers' compensation insurer and gave his findings and interpretation of the various tests and diagnostic procedures he had used. He testified on the general diagnosis of disc disease; explained medical terminology relevant to plaintiff's treatment; testified to his interpretation of other doctor's re-

ports which he had seen in making his diagnosis; testified to symptoms of disc disease; answered hypothetical questions about what his diagnosis would be, given certain symptoms; and gave his evaluation of Dr. Ramey's X-rays and X-ray report; his evaluation of X-rays and a medical test taken by other doctors after the disability period; and his disagreement with Dr. Ramey's diagnosis.

Nothing in this testimony went beyond plaintiff's statement of the "general substance of the testimony."

### VII. *Exclusion of the Ballard Deposition*

■ Appellants contend that the trial court erred in excluding from evidence the deposition testimony of a TOP employee, Loretta Ballard, who purportedly telephoned appellants' offices to schedule plaintiff's medical examination.

Plaintiff moved at trial to exclude the Ballard deposition from evidence. The facts which were before the trial court on that motion were as follows:

The depositions of Ms. Ballard and another witness were noticed by plaintiff, to occur at Troy, Michigan, where the witness worked and resided, on April 1, 1982, and "continue day to day until completed." After notice was given, however, TOP's counsel advised plaintiff that TOP would make Ms. Ballard available for deposition in Los Angeles. She appeared in Los Angeles on Friday, April 1, 1982, and, after the other witness' deposition was completed, hers commenced at about 1:35 p.m.

After four hours of testimony, TOP's counsel stated: "It's now almost 9:00 o'clock [p.m.] Michigan time. We have been going at this four and a half hours now. [¶] . . . [¶] . . . Mrs. Ballard has recently spent quite a bit of time in an airplane and I think under the circumstances we are about at the end of the line, as far as being able to testify without undergoing undue stress and perhaps affecting her ability to recall or testify accurately. I think we ought to close down."

TOP's counsel also informed plaintiff's counsel that Ms. Ballard was returning to Michigan and would not be available the next day, Saturday. Plaintiff's counsel insisted that Ms. Ballard's deposition should continue from day to day as stated in the notice of deposition and pursuant to the custom for out-of-town witnesses, but submitted under protest to termination of the deposition, stating for the record that he had not completed his examination. At no time did appellants offer an explanation for the refusal of TOP's counsel to produce Ms. Ballard for deposition the next day or for

the failure of TOP's counsel to fix a date certain for the continuance of her deposition. The Ballard deposition never resumed. Ms. Ballard did not attend trial.

In his motion to exclude her deposition testimony, plaintiff contended that he was deprived of his right to cross-examine this adverse witness.

After the conclusion of testimony and oral argument on the motion, the trial court ruled as follows: "It seems from all of the evidence here, including Miss Tatum's [TOP's counsel] testimony, declarations, and a reading of this transcript that *there was an expectation that this was to be a day to day type of deposition by reference to an earlier notice.* [¶] . . . . [¶] In the context of this lawsuit, with the enormous probing and development as to documents, other issues, the leisurely kind of examination and the voracious appetite for information and the length of the discovery conducted and examinations of witnesses, it would be very difficult for me to conclude fairly and rationally that there was the fair and full opportunity to examine Miss Ballard. [¶] . . . . [¶] And I have examined and re-examined the documents, the questions, the context, and considered the scope of the questions in this trial and the earlier notice and the declarations of the parties and *conclude that this was not the full opportunity to examine that was anticipated by counsel when he began his afternoon examination of Miss Ballard* who ostensibly was a more important witness at that time than Mr. Williamson, who was scheduled for the morning session and whose deposition concluded before Miss Ballard's began in the afternoon. [¶] . . . . [¶] *I, therefore, conclude that the testimony given by Miss Ballard at the time of the deposition is not usable in this trial except upon stipulation or agreement of counsel.*" (Italics added.)

"Generally, the admission of a deposition is a matter within the discretion of the trial court. [Citation.]" (*George* v. *Double D Foods, Inc.* (1984) 155 Cal.App.3d 36, 44 [201 Cal.Rptr. 870].) Where cross-examination was not completed, the trial court's refusal to admit the deposition is not ordinarily an abuse of discretion. (See *Pollard* v. *Pollard* (1959) 166 Cal.App.2d 698, 705 [333 P.2d 356].)

Particularly where, as here, the court has taken evidence in the form of declarations and testimony at the hearing on admissibility of the deposition, the court's determination is entitled to great weight on appeal, including substantial evidence effect as to any disputed issues of fact. Therefore, this court will not overturn the trial court's determination that plaintiff was not accorded a fair opportunity to examine the deponent.

 Even when deposition testimony is improperly excluded, however, the error must result in a miscarriage of justice to warrant reversal of the

judgment. (See *Chavez* v. *Zapata Ocean Resources, Inc.* (1984) 155 Cal.App.3d 115, 124 [201 Cal.Rptr. 887].) Assuming, without deciding, that the trial court erred in excluding the Ballard deposition testimony, that error did not result in a miscarriage of justice. Although appellants contend that they were prejudiced, the record indicates otherwise.

The only portions of the Ballard testimony that appellants deemed significant were the following:

"Q. When you telephone[d] Equifax here in Los Angeles to set in motion the medical examination, did you do that because Mr. Namel told you to by way of this memorandum . . .?

"A. No . . . Paul Namel approached my desk while I was operating the computer, said, 'Call Marietta [Wilhoit] and set up an exam,' gave me a telephone number, and I called.

"Q. Did you tell anybody at Equifax that you wanted to—or that Mr. Namel wanted to put the facts together concerning the Sprague matter to terminate his claim on a sound basis?

"A. No.

". . . . . . . . . . . . . . . . . . . . . . .

"Q. Did he ever tell you that he wanted to use the IME in this case as the basis for terminating Mr. Sprague's claim, or benefits, payment of his benefits?

"A. No."

First, Ms. Ballard's denials do not exclude communications by other TOP employees to appellants' personnel. There was evidence that other oral and written communications occurred between TOP and appellants about plaintiff's claim, but the contents of these communications were never disclosed. Therefore, even though one of appellants' employees, Mr. Roath, testified at trial that no TOP employee told him that TOP wanted to terminate plaintiff's benefits, inclusion of the Ballard deposition testimony would not have conclusively shown the contents of the communications between TOP and appellants, as appellants contend.

Second, the verdict in this case did not depend on the existence of express, contemporaneous communications between TOP and appellants regarding cutting off plaintiff's benefits. The evidence of the conspiracy to fraudu-

lently terminate his benefits was based largely on inference from appellants' regular practices and the way it offered its services to customers such as TOP, with assurances of "claims control." The absence of an express request to terminate benefits in one telephone conversation between Loretta Ballard and Marietta Wilhoit would not have been determinative.

VIII. *The Jury Instructions on Conspiracy*

Appellants' contentions with regard to the jury instructions are as follows: (a) No adequate instruction was given on the knowledge required for conspiracy; (b) the court unfairly emphasized the conspiracy theory by giving an excessive number of instructions on that theory; (c) the instructions were repetitious; (d) the instructions were vague; (e) the instructions were argumentative; (f) the instructions improperly used language of appellate court opinions, and (g) the instructions were inconsistent on the issue of when appellants' responsibility for wrongful acts towards plaintiff should commence.

A. *Instruction Regarding Knowledge Required for Conspiracy*

 Appellants contend that the jury instructions "are . . . devoid of a clear statement that 'knowledge' on Appellants' part of TOP's plan to deny [plaintiff's] insurance claim is a required element of the alleged 'conspiracy.'"[2]

---

[2]The instructions given on civil conspiracy were as follows: [BAJI No. 2.60:] "In this action the plaintiff has the burden of establishing by a preponderance of evidence all of the facts necessary to prove the following issues: [¶] 1. That a conspiracy to defraud plaintiff in connection with his insurance claim existed between Equifax and TOP; or [¶] 2. That Equifax defrauded plaintiff through false representations of material facts; or [¶] 3. That Equifax defrauded plaintiff through concealment or suppression of material facts; and [¶] 4. That plaintiff was totally disabled within the terms and meaning of the subject insurance policy as it is explained in these instructions. [¶] The particular elements of conspiracy and fraud, which plaintiff must also establish by a preponderance of the evidence, will be given to you shortly. . . ."
[BAJI No. 2.60 is merely a form of instruction on evidentiary burden, which requires the parties to fill in the particular issues relevant to their case.]
[Defendant's requested instruction (B):] "If Equifax did not act wrongfully in this case, Equifax is not to be held liable for any wrongful act by the insurance company in denying plaintiff's claim."
[Special instruction No. 1:] "In its evaluation of a disability claim, an insurance company may not deny without adequately investigating the foundation of its denial."
[Special instruction No. 13B:] "A civil conspiracy is an agreement between two or more persons to accomplish an unlawful purpose. [¶] The jury is to determine from the evidence and from these instructions whether a conspiracy existed between Equifax and TOP pertaining to plaintiff's insurance claim."
[Special instruction No. 14:] "For a plaintiff to recover damages on the theory of having been the victim of a civil conspiracy, he must establish by a preponderance of the evidence: (1) That Equifax entered into an express or tacit agreement with TOP to accomplish an unlawful purpose; (2) That a civil wrong has been committed against him and (3) That such

In *Wyatt* v. *Union Mortgage Co.*, *supra*, 24 Cal.3d 773, 784, the court held that, "[a]s long as two or more persons agree to perform a wrongful act, the law places civil liability for the resulting damage on *all* of them, regardless of whether they actually commit the tort themselves. [Citation.]

---

civil wrong has been a legal cause of injury or damage to him."

[Special instruction No. 16:] "To establish the existence of a civil conspiracy it is not necessary for the plaintiff to produce evidence that the parties thereto actually conferred prior to undertaking the performance of unlawful acts. [¶] Direct evidence of conspiratorial conduct is rare."

[Special instruction No. 17:] "A conspiracy may be inferred from the nature of the acts done, the relations of the parties, the interest of the alleged conspirators, and other circumstances."

[Special instruction No. 18:] "A person may be civilly liable for injuries or damages proximately resulting from a civil conspiracy which was formed or commenced prior to his involvement therein. [¶] It is not necessary that he should have joined the conspiracy at the time of its inception; every one who enters into such a common design or scheme is in law a party to every act previously or subsequently done by any of the others in pursuance of it."

[Special instruction No. 19:] "It is not a defense to a civil conspiracy action that one participant was acting at the request of another or that he was the agent of another party."

[Special instruction No. 20:] "Mere knowledge, acquiescence or approval of the act, without cooperation or agreement to cooperate is not enough for a defendant to be found liable for a civil conspiracy. However, once it is established by a preponderance of the evidence that there is cooperation or agreement to cooperate, a defendant may be held liable even if he committed no overt act and gained no benefit therefrom."

[Special instruction No. 21:] "A participant in a civil conspiracy is liable for all damages flowing therefrom of which the legal cause is the conspiratorial conduct."

[Special instruction No. 22:] "The scope of a civil conspiracy may be inferred from what was done in furtherance of it and from other surrounding circumstances."

[Special instruction No. 23:] "Each participant in a civil conspiracy is responsible for all damages proximately caused by the wrong, regardless of whether he was a direct participant and regardless of the degree of this activity. Each person who concurred in the wrongful scheme with *knowledge* of its *unlawful purpose* is liable for all damages proximately caused thereby." (Italics added.)

Appellants' requested jury instructions included an instruction on the issue of conspiracy, which was as follows:

"*Conspiracy*

"Plaintiff seeks to recover damages from defendants, and each of them, because they allegedly conspired to deny plaintiff's claim for benefits . . . .

"The essential elements of this tort, each element of which must be proved to recover damages . . . are:

"1. On May 6, 1977, plaintiff must have been totally disabled from performing any occupation for which he was reasonably suited by reason of his education, experience or training.

"2. A conspiracy must have been formed to produce a false medical report which would be used to deny plaintiff's insurance claim.

"3. Each of the defendants to be held liable therefor must have had knowledge that such conspiracy existed and that its purpose was unlawful.

"4. Each of the defendants to be held liable therefor must have either expressly or tacitly entered into the conspiracy.

"5. Dr. Ramey's resulting medical report must have falsely stated the degree of plaintiff's disability.

"6. Each of the defendants to be held liable therefor must have had knowledge that Dr. Ramey's May 6, 1977, medical report did not set forth the true state of plaintiff's disability.

"7. Plaintiff must have been damaged thereby."

'The effect of charging . . . conspiratorial conduct is to implicate all . . . who agree to the plan to commit the wrong as well as those who actually carry it out. [Citations.]' [Citation.] [¶] Therefore a plaintiff is entitled to damages from those defendants who concurred in the tortious scheme with knowledge of its unlawful purpose. [Citation.] . . ."

The instructions given by the court in this case reflected the requirement of agreement to commit a civil wrong and, further, adequately informed the jury that knowledge of the unlawful purpose was a necessary part of such an agreement. Appellants' requested instruction was not materially different from those given.

B. *The Instructions on Conspiracy Were Excessive in Number*

Appellants contend that the quantity of instructions on the issue of conspiracy overemphasized that theory of the case.

Although cases and commentators have criticized the practice of giving an excessive volume of instructions (see 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 208, pp. 3026-3027), a reversal on that basis is rare, and is reserved for those cases in which prejudicial error can be shown. (See *Stone v. Foster* (1980) 106 Cal.App.3d 334, 350 [164 Cal.Rptr. 901].)

In *Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 57-59 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878], the Supreme Court held that, where appellants attacked the jury instructions as a whole, alleging that they unduly emphasized and supported, and were repetitive of theories supporting respondent's case, a cautionary instruction that no undue emphasis was intended by repetition and that the judge did not intend to imply how any issue should be decided, should be considered in weighing the net effect of the instructions on the jury. (*Id.*, at p. 57.) Although repetition per se does not create prejudice, it is a factor to be considered in determining whether error is prejudicial. However, where the trial is long and bitterly contested, and the issues are confusing, it would be error for the judge to fail to give detailed instructions explaining the intricacies of the applicable law. (*Id.*, at p. 58.) Finally, "[w]hether a jury has been misled by an erroneous instruction or by the overall charge must be determined by an examination of all the circumstances of the case including a review of all of the evidence as well as the instructions as a whole." (*Id.*, at p. 59.)

In this case, the jury was instructed pursuant to BAJI No. 1.01, that no emphasis was intended by repetition. Applying *Bertero,* the instructions, as given, did not create prejudicial error, as they were consistent with the length and complexity of the case, and as the jury was cautioned against

inferring that emphasis on the conspiracy theory was intended. Examined as a whole, the instructions do not unfairly emphasize plaintiff's theory of the case.

### C. *The Instructions on Conspiracy Were Repetitious*

■ Appellants cite the following portions of the instructions as being improperly repetitious:

"A participant in a civil conspiracy is liable for all damages flowing therefrom . . . . Each participant in a civil conspiracy is responsible for all damages proximately caused by the wrong, regardless of whether he was a direct participant . . . . Each person who concurred [in the conspiracy] . . . is liable for all damages proximately caused thereby . . . . [E]veryone who enters [therein] is in law a party to every act . . . done . . . in pursuance of it. . . . [A] defendant may be held liable even if he committed no overt act . . . ."

As discussed above, repetition of a correct instruction rarely constitutes reversible error. Moreover, where repetitious instructions were given with a cautionary instruction that repetition did not imply emphasis, were repeated in a different context than first stated, and served a purpose, repetition will not be considered prejudicial error. (*Stone* v. *Foster, supra,* 106 Cal.App.3d 334, 350.)

Here, there was no reversible error.

### D. *The Instructions Were Vague*

■ Appellants contend that the instructions on conspiracy were vague because they included the following phrases:

"[A]n agreement . . . to accomplish *an unlawful purpose.* . . . [T]hat a *civil wrong* has been committed . . . . A conspiracy may be inferred from the nature of the acts done, the relations of the parties, the interests of the alleged conspirators *and other circumstances.* . . . *Mere knowledge, acquiescence or approval of the act without cooperation or agreement to cooperate is not enough* for a defendant to be found liable for a civil conspiracy. . . . A participant in a civil conspiracy is liable for all damages flowing therefrom *of which the legal cause is the conspiratorial conduct.* . . . The scope of a civil conspiracy may be inferred from what was done in furtherance of it *and from other surrounding circumstances.*"

On appellate review, the instructions must be considered as a whole, and, if, when so considered, they state the law of the case fairly and clearly,

then they are not objectionable even though isolated passages may be subject to criticism. (*Little* v. *Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 464 [136 Cal.Rptr. 653], citing 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 244, pp. 3057-3058.)

Many of the phrases to which appellants object were explained with reference to other instructions. In the absence of a showing that the instructions read as a whole did not accurately present the law, appellants' contention in this matter is without merit.

### E. *The Instructions Were Argumentative*

 Appellants cite as argumentative the following instructions:

(1) "[D]irect evidence of conspiracy is rare," (which was given in the context of an instruction that it was not necessary for plaintiff to produce evidence that the defendants actually conferred prior to performing the illegal acts, and with an instruction that a conspiracy may be inferred from the nature of the acts, the relation of the parties and the interest of the conspirators); and

(2) "[I]t is not a defense to a civil conspiracy that one participant was acting at the request of another or that he was the agent of another party."

 "An argumentative instruction is one which embodies detailed recitals of fact drawn from the evidence in such a manner as to constitute an argument to the jury in the guise of a statement of law. (See 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 211, pp. 3028-3029.)" (*Stone* v. *Foster, supra,* 106 Cal.App.3d 334, 349.)

 Whereas the comment that "direct evidence of a conspiracy is rare," might better have been left for argument to the jury, in the context of these instructions, it did not prejudice the case, as it formed only a part of instructions which were a correct statement of the law of conspiracy.

The second instruction of which appellants complain was a correct statement of the law, and not argumentative.

### F. *The Instructions Improperly Used Language From Appellate Opinions*

 Appellants contend that because the instructions included language taken from appellate opinions, the instructions were argumentative, inconsistent, repetitious, and vague. Appellants have not pointed out which of

the instructions were improperly taken from appellate opinions, and in what manner they misstated the law.

Not all instructions taken from the language of appellate opinions are objectionable. As Witkin says, "Correct statements of law are obtainable from opinions of the reviewing courts, and these are necessarily the principle *source* of instructions. Many are taken verbatim from such opinions. But an extract may be inappropriate if the facts underlying the opinion are different from those presented in the new case. Hence the courts occasionally speak of the 'danger inhering in the practice of copying language used in an opinion of a reviewing court.' [Citations.]" (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 202, p. 3020.)

BAJI does not contain an approved form instruction on civil conspiracy. Thus, the court was required to accept instructions drafted and proposed by the parties, which were necessarily taken mainly from appellate opinions. The only danger in this practice would be if inappropriate statements from opinions were adopted as general statements of law for the jury. As we have already reviewed the instructions and determined that they were not improperly vague or argumentative, and were not such as to mislead the jury, we must reject this contention.

### G. *The Instructions Were Inconsistent*

Appellants urge the court to "compare repetitive instructions" that "[a] person may be civilly liable for injuries or damages proximately resulting from a civil conspiracy which was formed or commenced *prior to his involvement therein,*" and a conspirator is liable for "every act *previously* or subsequently *done by any of the others* in pursuance of" the conspiracy, with instructions that "even if you find that Equifax and TOP did conspire . . ., *you are not authorized to include in any assessment of damages the conduct of TOP occurring prior to April 25, 1977,* nor any emotional distress suffered by plaintiff as a result thereof" and "the first termination of benefits by TOP predated the involvement of Equifax, and Equifax is not responsible therefor." (Italics added.)

The instruction of which appellants complain, which is set forth at contention VIII, A., *supra,* is a correct statement of law, taken from *De Vries* v. *Brumback* (1960) 53 Cal.2d 643, 648 [2 Cal.Rptr. 764, 349 P.2d 532].

The record reflects that the "inconsistent" qualification of that instruction, a "court's proposed instruction," which provides that appellants were not responsible for damages occurring because of TOP's conduct before

TOP contacted appellants, was added because the parties stipulated that appellants were not responsible for the first termination of benefits by TOP.

Accordingly, this contention is without merit.

IX. *The Six Instructions*

In an appendix to the opening brief of appellant Equifax Services, Inc., appellants contend that six instructions were improperly refused by the court. Appellants recite the refused instructions and cite, without comment, various appellate opinions from which the statements embodied in the instructions presumably were derived. They make no attempt to argue the applicability of the refused instructions to the facts of this case, or to cite authority for giving such instructions in a case of this type. Likewise, there is no showing of prejudice.

"The reviewing court is not required to make an independent, unassisted study of the record in search of error or grounds to support the judgment. It is entitled to the assistance of counsel. Accordingly every brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration." (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 425, p. 4391, and cases cited therein.)

It is the duty of appellants' counsel, not of the courts, "by argument and the citation of authorities to show that the claimed error exists." (*Estate of Randall* (1924) 194 Cal. 725, 728 [230 P. 445].) Therefore, we deem it sufficient to deal in general terms with appellants' bare assertions of instructional error. (See, e.g., *Stevens* v. *Parke, Davis & Co., supra*, 9 Cal.3d 51, 70-71.)

Refusal to give the proposed instruction from BAJI No. 12.78, to the effect that outrageous conduct may be privileged when defendant insists on his rights in good faith and in a permissible way, cannot have been prejudicial in this case, where the jury found that appellants acted in bad faith as part of a conspiracy to deny an insurance claim.

Appellants' requested instruction regarding privileged publications was, likewise, applicable only if there was a lack of malice or a reasonable basis for believing the communication to be innocent. The same is true of appellants' proposed instruction that if the communications of Mr. Roath to TOP and Dr. Ramey are found to be without malice, the communications are privileged.

Appellants' requested instruction, to the effect that they were not parties to the insurance contract, and, therefore, owed no duty to investigate plaintiff's claim, is inapplicable to the evidence, because it was uncontroverted that appellants, in fact, undertook to investigate, and the jury found that the investigation was undertaken as part of a conspiracy to do what TOP could not do directly, that is, to fraudulently deny the claim.

Appellants' requested instruction that Dr. Ramey owed no duty of care to plaintiff with respect to his report to the insurance company, was irrelevant, as Dr. Ramey was no longer a defendant.

Appellants have not sustained their burden of showing that any prejudicial error resulted from the refusal of these instructions. For this reason also, their contentions must be rejected. (See *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 767 [206 Cal.Rptr. 354, 686 P.2d 1158].)

X. *BAJI Nos. 2.02 and 2.03*

 Appellants contend that the court erred in giving BAJI No. 2.02 which states that if a party offers weaker evidence when it can offer stronger evidence, that evidence should be viewed with distrust, and No. 2.03, which states that if the jury finds a party has willfully suppressed evidence, they may consider that fact in drawing inferences.

Giving these instructions was proper, as there was evidence from which it could reasonably be concluded that appellants failed to produce stronger evidence or willfully suppressed evidence. For example, there was evidence that Mr. Roath's personnel file did not contain the number of documents for the years 1976 and 1977 which should have been there despite appellants' knowledge, within six months after plaintiff's benefits were terminated, that plaintiff had filed suit. Mr. Roath's supervisor testified that he had probably taken documents out of the file pursuant to a procedure which appellants called "experting." This procedure was not instituted until after the present suit was filed.

This, and other instances of the unavailability of documents which appellants could have been expected to possess, such as documents relating to plaintiff's and other medical examinations, supplied sufficient evidence to support giving these instructions. The inferences to be drawn from the evidence on the basis of these instructions were for the jury.

THE CROSS-APPEAL

 Plaintiff contends in his cross-appeal that the trial court erred in reducing the award of punitive damages from $5 million to $1 million.

However, in making this contention, plaintiff must overcome the great weight accorded by the statutes and decisional authorities to the trial court's determination, on motion for new trial, that damages are excessive.

The court's minute order denying the motion for new trial, conditional upon plaintiff's consent to reduction of punitive damages, read, in pertinent part, as follows: "For reasons stated by the Court . . . and the *additional reason of disproportionately high ratio of punitive damages to compensatory damages, the jury's award of punitive damages in the amount of $5 million dollars is found to be excessive as a matter of law.* [¶] *After an independent review of the evidence* and consideration of the applicable factors reviewed by the Court . . . the Court grants a new trial limited to the issue of punitive damages unless plaintiff consents to a reduction of punitive damages to the amount of one million dollars ($1 million) *found by the Court to be fair and reasonable based on the evidence and law.*" (Italics added.)

The court considered the evidence in the light of the following factors, taken from *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 928: The serious effect of appellants' actions on plaintiff and others; the amount of the compensatory damages award; the relationship of the amount of compensatory damages to the amount of punitive damages; the net and gross wealth of appellants; the net yearly income and net worth of appellants for 1981 and preceding years; the reprehensible nature of appellants' conduct; and the amount necessary for punishment and deterrence.

The court also considered the ratio of appellants' net income and net worth to the punitive damages award and the ratio of the compensatory to the punitive damages award and compared these ratios to those in *Egan* v. *Mutual of Omaha, supra,* 24 Cal.3d 809, 823-824. The court concluded that the punitive damages were too great in relation to net worth, net income and compensatory damages. In *Egan,* the court held that, viewing the evidence in the light most favorable to the judgment, punitive damages which were 40 times the compensatory damages of $123,600, and represented two and one-half months of defendant's net income, must be deemed the result of passion and prejudice and excessive as a matter of law. In conclusion, the court commented that the remitted amount of punitive damages in relation to net worth was comparable to that in *Little* v. *Stuyvesant Life Ins. Co., supra,* 67 Cal.App.3d 451, although less than amounts upheld by the appellate court in *Zhadan* v. *Downtown Los Angeles Motor Distributors, Inc.* (1979) 100 Cal.App.3d 821 [161 Cal.Rptr. 225], and *Godfrey* v. *Steinpress* (1982) 128 Cal.App.3d 154 [180 Cal.Rptr. 95].

Our review of this order is governed by the following authorities: "[W]hen a trial court grants a new trial on the issue of excessive damages,

. . . the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the order. . . . 'Whatever may be the rule which should govern the trial judge, it is certain that when his action in granting a new trial on the ground of excessive damages, or requiring a reduction of the amount as the condition of denying one, comes to be reviewed on appeal, his order will not be reversed unless it plainly appears that he abused his discretion; and the cases teach that when there is a material conflict of evidence regarding the extent of damage the imputation of such abuse is repelled, the same as if the ground of the order were insufficiency of the evidence to justify the verdict.' [quoting *Doolin* v. *Omnibus Cable Co.* (1899) 125 Cal. 141, 144-145 (57 P. 774)] . . . The reason for this is that the trial court, in ruling on the motion, sits not in an appellate capacity but as an independent trier of fact." (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 932-933.)

Section 657 provides as follows regarding motions for new trial on the issue of excessive damages: "[A] new . . . trial [may be] granted . . . for any of the following causes . . .: [¶] . . . . [¶] 5. Excessive or inadequate damages. [¶] . . . . [¶] 7. . . . . [¶] When a new trial is granted . . . the court shall specify the ground or grounds upon which it is granted and the court's reason or reasons for granting the new trial upon each ground stated. [¶] A new trial shall not be granted upon the ground . . . of excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision. [¶] [I]f the motion is granted [the order] must state the ground or grounds relied upon by the court, and may contain the specification of reasons. . . . [¶] On appeal from an order granting a new trial the order shall be affirmed if it should have been granted upon any ground stated in the motion, whether or not specified in the order or specification of reasons, except that (a) the order shall not be affirmed upon the ground of . . . excessive or inadequate damages, unless such ground is stated in the order granting the motion and (b) on appeal from an order granting a new trial upon the ground of . . . excessive or inadequate damages, it shall be conclusively presumed that said order as to such ground was made only for the reasons specified in said order or said specification of reasons, and such order shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons."

Section 662.5, subdivision (b) provides: "If the ground for granting a new trial is excessive damages, [the trial court may in its discretion] make its order granting the new trial subject to the condition that the motion for a new trial is denied if the party in whose favor the verdict has been rendered consents to a reduction of so much thereof as the court *in its inde-*

*pendent judgment determines from the evidence to be fair and reasonable."* (Italics added.)

In *Grimshaw* v. *Ford Motor Co., supra,* 119 Cal.App.3d 757, plaintiff appealed from the trial court's order denying a new trial if plaintiff consented to a reduction in punitive damages from $125 million to $3½ million. In affirming, the court concluded that: (1) Pursuant to *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, a presumption of correctness attaches to the order, and it will not be reversed unless it plainly appears that the trial court abused its discretion; (2) the specification of reasons in punitive damages cases is adequate if it reveals how the court applied the decisional guidelines for determining the propriety of punitive damages awards to the evidence; and (3) consistently with section 662.5, which provides that the trial court is to determine whether the award was fair and reasonable upon an independent review of the evidence, and section 657, which provides that an order denying a new trial conditional upon a reduction of damages shall be based upon an independent review of the evidence by the trial court, the trial court sits as an independent trier of fact on such a motion, and should be reversed by the appellate court only when the reasons given by the trial court "reflect a manifest and unmistakable abuse of discretion." (*Grimshaw, supra,* 119 Cal.App.3d at pp. 822-823.) Accordingly, the court rejected plaintiff's contention that the reduction of punitive damages must be reversed because the trial court had based its order on the ratio of punitive to compensatory damages. The appellate court found that the trial court had based its order also on an independent review of the evidence, and on the degree of defendant's reprehensibility, the wealth of defendant and its capacity to generate profits, which were proper considerations for determining whether the award was excessive "as a matter of law." Therefore, the appellate court held that it could not say that the trial court had committed a manifest abuse of discretion, or that there was "no substantial basis in the record" for the reasons given in the order, as section 662.5 would require for reversal.

Following the reasoning of *Grimshaw,* and relying upon *Neal* and sections 657 and 662.5, we have concluded that the trial court's order must be affirmed. The record reflects that the court applied recognized factors, (which are found in *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 928), for determining the amount of punitive damages awards in relation to the evidence in this lengthy trial. The court's specification of reasons was adequate to reveal how the court applied these guidelines, and it does not appear that the court committed a "manifest and unmistakable abuse of discretion." (§ 657.)

Plaintiff fastens upon the court's conclusion that punitive damages were excessive "as a matter of law," as evidence that the court did not indepen-

dently review the evidence on the issue of damages. However, the court's specification of reasons, read fairly and as a whole, shows that the court did independently review the evidence on such diverse factors, among others, as the fact that the jury's punitive damage award represented over four months worth of appellants' net income for 1981, the seriousness of the wrong and the amount necessary to deter future conduct. "[T]o state that the damages awarded by the jury are excessive is simply one way of saying that the evidence does not justify the amount of the award." (*Stevens* v. *Parke, Davis & Co., supra,* 9 Cal.3d at p. 61.) Similarly, the court's conclusion here that punitive damages were excessive "as a matter of law" was merely one way of saying the court had concluded that they were excessive, considering the evidence and applicable factors.

Appellants also contend that the court's comparison of this award with that in other cases shows that the court improperly considered itself bound by a set ratio of punitive damages to income, worth, or compensatory damages. However, the totality of the record reflects that the trial court's review of the awards in other appellate and Supreme Court decisions were used only for guideline purposes, in conjunction with a review of other factors and the evidence.

The mandate of the statutes is clear, and has been followed by this state's appellate courts. Therefore, regardless of what this court might have concluded upon a review of the evidence would be a fair and reasonable award of punitive damages, we are constrained to affirm the trial court's well-considered determination.

### DISPOSITION

The judgment, and the order denying the motion for new trial conditional upon plaintiff's consent to reduction of punitive damages, are affirmed.

Kingsley, Acting P. J., and McClosky, J., concurred.

A petition for a rehearing was denied May 8, 1985.