[No. B010769. Second Dist., Div. Three. May 15, 1986.]

ELITA KIM WILLIAMS, Plaintiff and Respondent, v.
VOLKSWAGENWERK AKTIENGESELLSCHAFT et al.,
Defendants and Appellants.

1248

■■■■■■
■■■■■■■■■■■

COUNSEL

Carroll, Burdick & McDonough, Justs N. Karlsons, Donald T. Ramsey, Chapman & Glucksman, Richard H. Glucksman, Herzfeld & Rubin, Martin S. Friedlander and Seymour W. Croft for Defendants and Appellants.

Browne Greene, Charles B. O'Reilly, Steven J. Wilson, Greene, O'Reilly, Broillet, Paul, Simon, McMillan, Wheeler & Rosenberg for Plaintiff and Respondent.

OPINION

**MILLS, J.**\*—Defendants and Appellants, Volkswagen of America, Inc. (VWOA), Marina Volkswagen (Marina) and Volkswagenwerk Aktiengesellschaft (VWAG) appeal from judgment entered on a verdict and from the denial of defendants'[1] motions for judgment notwithstanding the verdict.

FACTUAL AND PROCEDURAL BACKGROUND

On May 15, 1976, respondent-plaintiff Elita Kim Williams (Williams) purchased a 1975 Volkswagen Dasher automobile which had been used as a demonstrator from Marina Volkswagen. She signed a used vehicle certificate. The odometer showed 8,740.3 miles.

During the early morning of April 2, 1977, after leaving a party where she drank a glass of wine, Williams lost control of her car after it was bumped on the right rear by an unidentified vehicle as it rounded a curve on Sunset Boulevard. The Dasher veered to the left, crossed the opposite lanes of travel, struck the opposite curb with such force that its underside was "totalled" and she sustained severe injuries, including massive facial fractures, lacerations, permanent indentation of the skull, damage to her eyes and brain damage.

Williams filed her original complaint on March 30, 1978. She sued "Defendant Doe I" for negligent operation of the unidentified vehicle, and VWOA and Marina for strict liability and negligence. The pleading alleged that the Dasher was defective because its right rear trailing arm assembly broke, rendering the vehicle uncontrollable after impact with the unidentified automobile.

---

\*Assigned by the Chairperson of the Judicial Council.

[1]Where appropriate defendants are hereinafter referred to collectively as VW.

She filed her first amended complaint on February 29, 1980, suing VWOA (the importer-distributor), Marina (the dealer), and VWAG (the manufacturer) for strict liability, breach of implied warranty and negligence and alleging negligent design, inspection and manufacture of uncrashworthy vehicle.

In pretrial discovery depositions were held; appellants served five sets of interrogatories that asked for the disclosure of the facts and contentions underlying Williams' claims of negligence and product defect. The answer was that the trailing arm was defective because it broke. Seven motions to compel further answers, or to compel compliance with prior court orders requiring further answers were filed on behalf of VW. On February 7, 1983, Williams's answers to interrogatories added the steering wheel and steering column as defective components.

Between October of 1978 and March of 1982, Williams propounded five sets of interrogatories, which included inquiries about both the trailing arm and steering system. She also made four motions to compel further answers, two requests for production of documents and requests for admission. By stipulation, during discovery proceedings in open court on December 23, 1981, VWAG agreed and the court ordered it to provide information on "Whether steering mechanism of 1975 Dasher had a safety factor built in to react to a failure of trailing arm system. . . ." The answer was not given.

On December 1, 1982, VWOA and VWAG filed a demand for election of experts pursuant to Code of Civil Procedure sections 2037, 2037.1 and 2037.9. On December 20, 1982, Williams filed designation of expert witnesses containing 73 names; Dr. Michael Eugene Fourney, a stress analyst, was not included.

The case was originally set for trial on December 9, 1981, then moved to June 14, 1982, February 7, 1983, February 9, 1983, February 28, 1983, and finally assigned for trial on March 1, 1983. Trial commenced on March 3, 1983.

At the trial Dr. Kashar, a metallurgist, testified that he had found a manufacturing defect in the trailing arm in the form of major "inclusions" in steel at the fracture site resulting in reduced strength of the steel and leading to its fracture.

John Marcosky, a mechanical engineer, testified that the steering wheel was defectively designed because the spokes of the wheel were not covered with the same wrapping and cushioning that covered the hub. (In its trial

memorandum, VWAG requested that Marcosky be precluded from rendering opinions or conclusions not disclosed in his deposition. When it appeared that the court would allow the witness to address defects in the steering wheel and steering assembly, VWAG moved for a mistrial. The motion was denied.)

Dr. David Douglas, a metallurgist, testified that the trailing arm developed a fracture as a result of fatigue failure and as a result of possible manufacturing defects and that his opinion rested upon stress analyses performed for him by Dr. Fourney, a stress analyst, after the commencement of trial.

Dr. Fourney testified to certain measurable stress intensity factors on which Douglas based his opinions. Following Fourney's direct examination, VWAG made motions to strike portions of the Douglas testimony which relied upon him, for a mistrial and for a continuance. The motions were denied.

The jury was instructed and began its deliberations on May 9, 1983. The special findings requested the jury to determine whether or not there was a defect in the design of the trailing arm and/or, steering wheel system, whether or not VWOA, VWAG and Marina were negligent, whether or not their negligence caused injury to Williams, whether or not VWOA, VWAG and Marina breached warranties to Williams and whether or not such breach caused injury to her; finally, the jury was requested to determine whether or not Williams was contributorily negligent. On May 11, 1983, the jury returned its verdict with special findings.

The jury found that there was no design defect in the trailing arm or in the steering wheel system; that VWAG was negligent and caused injury to Williams; that VWOA and Marina were not negligent; that VWOA, VWAG and Marina breached warranty and caused injury to Williams. It awarded compensatory damages in the amount of $1,376,989.24 against VWOA, VWAG and Marina, and, after determining that Williams was 6 percent contributorily negligent, reduced the compensatory damages awarded to $1,294,284.35.

VWOA, VWAG and Marina timely moved for judgment notwithstanding the verdict and for a new trial on all statutory grounds. The motions were denied and on August 5, 1983, they filed notice of appeal.

### CONTENTIONS

VWOA, VWAG and Marina contend that reversal is mandated and a new trial required because:

1. The trial court denied their right to a fair trial and abused its discretion under Code of Civil Procedure sections 2037-2037.6 by permitting Williams to conduct a trial by "ambush," including: (a) refusing to sanction her failure to discover; (b) allowing her to raise the issue of steering assembly defect after close of discovery; (c) allowing her to offer opinions and data of experts who were not revealed in pretrial discovery; (d) allowing her to elicit undisclosed opinions on accident reconstruction, and theories of defect of the trailing arm, from experts Marcosky, Kashar and Douglas who had expressed no such opinions at their pretrial depositions and (e) refusing to grant a continuance in order to evaluate and rebut surprise expert testimony;

2. The trial court committed prejudicial error by permitting Williams's experts to speculate about "possible" defects in areas outside their field of expertise and concerning matters that were without foundation in fact;

3. The verdict of negligence and breach of warranty against VWAG is fatally inconsistent with the special finding that there was no design defect in the trailing arm or in the steering wheel system;

4. The verdict for breach of warranty is against the law;

5. Williams's counsel committed prejudicial misconduct by misstating the evidence and the law and inviting the jury to speculate about matters outside the record in closing argument.

SUMMARY

The trial court ruled properly in denying VW's motions for judgment notwithstanding the verdict and for a new trial. The record shows no error in its rulings, either in the form of abuse of discretion relative to discovery, the admissibility of expert opinion testimony, the "misconduct" of counsel and requests for continuances, or in its determining the legality and consistency of the verdict and special findings.

DISCUSSION

I. *There Are No Abuses of Discretion by the Trial Court*

VW is correct in stating that the California Discovery Act of 1957 was designed to enhance the truth-seeking function of the litigation process and eliminate trial strategies that focus on gamesmanship and surprise. As the California Supreme Court stated in explaining the purpose of the new legislation: "[T]he Legislature intended to take the 'game' element out of

trial preparation while yet retaining the adversary nature of the trial itself. One of the principal purposes of discovery was to do away 'with the sporting theory of litigation—namely, surprise at trial.'" (*Greyhound Corp.* v. *Superior Court* (1961) 56 Cal.2d 355, 376 [15 Cal.Rptr. 90, 364 P.2d 266].)

The overall intent of the Discovery Act, said the court, was to: "[M]ake a trial less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." (*Greyhound Corp.* v. *Superior Court, supra,* at p. 376.)

It is also beyond dispute that the rules of discovery have serious potential for abuse. (See *Day* v. *Rosenthal* (1985) 170 Cal.App.3d 1125, 1172 [217 Cal.Rptr. 89]; *Greyhound* v. *Superior Court, supra,* 56 Cal.2d 355.) However, it is for this reason that the lower court is vested with wide discretion to prevent abuse, the exercise of which will not be disturbed on appeal in the absence of a clear showing that the court acted unreasonably. (*Id.,* see also *Cembrook* v. *Superior Court* (1961) 56 Cal.2d 423, 427 [15 Cal.Rptr. 127, 364 P.2d 303]; *Heffron* v. *Los Angeles Transit Lines* (1959) 170 Cal.App.2d 709, 713 [339 P.2d 567, 74 A.L.R.2d 526].)

### 1. *There Is No Prejudicial Failure to Participate in Discovery*

Appellants attempt to pinpoint one instance in which Williams's answers to interrogatories were nonresponsive. They argue that the trial court erred in its October 13, 1982, order denying a motion to compel further answers to interrogatories or in the alternative to strike the complaint and dismiss the action, or to preclude the introduction of certain evidence. There is insufficient showing of such an error. Upon examining the record, it is clear that the court may have denied the motions on any number of grounds, including VWOA's acknowledgement, in its declaration in support of the motion, that it was not filed within the statutory time.[2]

Cases cited by appellants on this point are not persuasive under the facts of this case. In *Karz* v. *Karl* (1982) 137 Cal.App.3d 637 [187 Cal.Rptr. 183], this division upheld sanctions precluding plaintiff from proving essential elements of his causes of action upon determining that the trial court

---

[2]Allan M. Rosenthal's declaration dated September 1, 1982, recites, in part, as follows: "Pursuant to California Rules of Court, Rule 222.1, defendant has made a reasonable attempt to resolve this matter informally. . . . As a result of plaintiff's uncooperative attitude, defendant VWOA inadvertently failed to file the instant motion within the statutory period for doing so.

"Accordingly, defendant VWOA respectfully requests that the court rule on the merit of further answers without objections to the requested interrogatories."

found that "plaintiff willfully failed to make discovery . . ., to follow the Court's Discovery Order . . . and that good cause appeared for making the order. . . ." (*Id.*, at p. 649.) There has been no such finding here. The appellate court emphasized that the award of discovery sanctions is a matter within the trial court's discretion and that in attacking that order an abuse of discretion must be shown. (*Id.*, at p. 648.)

In *Williams* v. *Travelers Ins. Co.* (1975) 49 Cal.App.3d 805 [123 Cal.Rptr. 83], the trial court was affirmed in its decision to strike the complaint after determining that plaintiff failed to substantially comply with the court's discovery orders (*id.*, at p. 809) and where the record was replete with evidence of continuous use of obstructive tactics and other conduct which "stretched the court's toleration of his conduct beyond the breaking point." (*Id.*, at p. 810.)

In *Campain* v. *Safeway Stores* (1972) 29 Cal.App.3d 362 [104 Cal.Rptr. 752], the trial court was reversed for not granting defendant's motion for a mistrial where the issue had been "set at rest" during discovery and the production of evidence sought to review the issue and defendant was "genuinely surprised" by it. Here, the issue of defects in the steering mechanism was neither "at rest" nor should appellants have been surprised by its treatment at trial. As a matter of fact, this issue was restively present at least as early as the court order of December 23, 1981, in which appellants were required to provide information concerning it (*ante,* at p. 1252) and Williams's successful motion to continue of March 29, 1982, on the grounds that the order had not been complied with, and as late as February 7, 1983, when reference to it was made in answers to interrogatories and about which lateness VW here complains. The trial court did not abuse its discretion in denying VW's motions for sanctions for Williams's failure to participate in discovery.

### 2. *There Is No Prejudicial Failure to Disclose Expert Opinions*

VW's suggestion that the trial court, through its erroneous admission of certain "surprising" evidence, has joined in their "ambush," is without merit. That term is an inappropriate appellation in this case.[3] It is contended,

---

[3]Unfortunately the terminology and deportment of the legal profession often resemble the equipment of war, loaded with the language of terror and the posturing of the invincible or the violated, as the case may be, aimed at capturing the conviction of some judge(s), as sensitive, perhaps, to the essence of smoke and powder as to the substance of fact and law. More often than not, however, such stratagems, when the haze of engagement clears, amount to little more than a smoldering disappointment at what the trier has found. Such indignation, phrased in terms as benign as those which describe the computed movements of video games, surely better explain selection of the term "ambush." The facts of this case do not resemble in the least the ground where Custer fell.

in summary, that prejudicial error was committed when the trial court admitted the undisclosed "surprise" trial opinions of Williams's experts contradictory of or nonexistent at their depositions. For example, that before testifying at trial as set out above (*ante,* at p. 1252) the witnesses deposed contrarily, inter alia, as follows:

Marcosky had no opinion about the steering assembly (versus it was defectively covered); Dr. Kashar found no manufacturing defect in the trailing arm (versus he found "inclusions"); Dr. Douglas's only opinion was that the trailing arm had fractured as a result of an impact (versus fatigue failure). They argue that these expert opinions were impermissible pursuant to Code of Civil Procedure sections 2037-2037.6.[4]

Section 2037.3 and the case law, require that "the general substance of the testimony which the witness is expected to give" must be disclosed upon proper request. As interpreted by the California courts, this requires a party to "disclose the *substance* of the facts and the opinions to which the expert will testify, either in his witness exchange list, *or in his deposition,*

---

[4]Those sections provide in pertinent part as follows:

"Section 2037. (a) Not later than the 10th day after a trial date is selected or 70 days prior to the date set for the commencement of trial, whichever is later, any party may serve on any party a demand to exchange lists of expert witnesses."

"Section 2037.3. Each witness list shall include the name and business or residence address of each expert witness whom the party expects to call in person or through deposition and a brief narrative statement of the qualifications of such witnesses and the general substance of the testimony which the witness is expected to give. . . ."

"Section 2037.4. A party who is required to exchange lists of witnesses shall diligently give notice to the parties upon whom his or her list was served if, after service of it, he or she determines to call an expert witness not included in it, and a party shall make available for deposition such expert witnesses as he or she has determined to call and shall immediately make available for inspection and copying all of such expert witness' discoverable reports and writings."

"Section 2037.5. Except as provided in Section 2037.6, upon objection of a party who has served his list of witnesses in compliance with Section 2037.2, no party required to serve a list of expert witnesses on the objecting party may call an expert witness to testify, except for purposes of impeachment, unless the requirements of Section 2037.3 for that witness have been met."

"Section 2037.6. (a) The court may, upon such terms as may be just (including but not limited to continuing the trial for a reasonable period of time and awarding costs and litigation expenses), permit a party to call a witness, or permit a witness called by a party to testify to an opinion or data on direct examination, during the party's case in chief where such witness, is required to be, but is not, included in such party's list of expert witnesses so long as the court finds that such party has made a good faith effort to comply with Sections 2037 through 2037.3, inclusive, that he has complied with 2037.4, and that as of the date of exchange he:

"(1) Would not in the exercise of reasonable diligence have determined to call such witness; or

"(2) Failed to determine to call such witness through mistake, inadvertence, surprise or excusable neglect."

or both." (*Swickard* v. *Crecelius Ranches, Inc.** (Cal.App.); *Kennemur* v. *State of California* (1982) 133 Cal.App.3d 907, 918 [184 Cal.Rptr. 393].) *Kennemur* does not require disclosure of specific facts and opinions as suggested by VW. (See *Sprague* v. *Equifax, Inc.* (1985) 166 Cal.App.3d 1012, 1040 [213 Cal.Rptr. 69].) Such a requirement would defy the clear language of the section and the practical dynamics of intelligent trial preparation.

Section 2037.4 outlines the circumstances wherein a party may amend the original disclosure, and section 2037.6 sets out the circumstances wherein the trial court may exercise its discretion to allow the admission of expert testimony that was previously undisclosed.

In order to prevail on the issue of the admissibility of such evidence, VW is required to establish that expert testimony was admitted contrary to the provisions of section 2037 and that the admission of such testimony constituted an abuse of discretion that prejudiced the defense. That burden is not met. The record establishes that there were no "new," "surprise," "undisclosed," opinions and that, even if they were undisclosed, the trial court did not abuse its discretion in permitting the testimony.

The Williams's expert list meets the requirements of section 2037.3. (See *Sprague* v. *Equifax, Inc., supra,* 166 Cal.App.3d 1012.)[5] There is no discernible pretrial complaint of its inadequacy called to our attention by VW by way of motion to compel pursuant to Code of Civil Procedure section 2034, subdivision (a) or otherwise.

---

*Reporter's Note: Deleted on direction of Supreme Court by order dated May 16, 1985.

[5]Witnesses Kashar, Douglas and Marcosky, were designated as follows:

"3. Dr. Lawrence Kashar
"Failure Analysis Assoc., 11777 Mississippi Ave.,
"West Los Angeles, California
"Dr. Kashar is an independent metallurgist. He is expected to testify regarding metallurgical issues concerning the trailing arm in question and cause of accident herein."
"4. Dr. David Douglas
"UCLA
"Los Angeles, California 90024
"Dr. Douglas is an independent metallurgy expert. He is a professor at UCLA, and is expected to testify that the trailing arm which forms the subject of this lawsuit was defective when sold and was improperly designed, manufactured, tested, inspected and serviced. He will further testify as to the cause of plaintiff's injuries and damage to the plaintiff's vehicle."
"6. John Marcosky
"3000 Town Center
"Southfield, Michigan 48075
"Mr. Marcosky, a mechanical engineer, is an independent accident reconstruction expert and will testify as to the nature of the accident, the cause of the accident and design, manufacture, installation and negligent inspection and maintenance issues concerning the subject accident."

Dr. Kashar was designated by Williams as a specialist in metallurgy who would render opinions on the metallurgical aspects of the trailing arm and the cause of the accident. He was deposed and provided opinions on the metallurgical aspects of the trailing arm and the relationship to the cause of the accident. At the trial he testified to certain metallurgical flaws amounting to manufacturing defects after having testified at his deposition that he found none. VW complains about the inconsistency on appeal, undaunted by the hobgoblins of consistency, even though reference was made to it during cross-examination, presumably with the idea in mind of impressing the jury with the witness's unreliability.

The trial court, in its portion of an exchange with counsel in open court, best explains why Marcosky had such limited opinions at deposition and why his opinions at trial were not considered "new": simply, he had limited access to the vehicle and its parts and from counsels' arguments as well as perusal of the depositions of defense experts it was clear that VW had notice of the possible areas of his testimony.[6]

■ VW's criticism of Dr. Douglas's testimony is that at trial he completely reversed his opinion about the relative importance of impact and fatigue failure of the trailing arm based solely on the stress analysis by Dr.

---

[6]"THE COURT: First, as far as the contention the defense has not had adequate discovery, we have had a number of conversations—both informally and formally on the record—concerning those contentions.

"I think we started with the point that the reason Mr. Marcosky had so few opinions at his first deposition, is that he had just then been able to inspect the car. Apparently, there was a lot of delay in allowing the defense to inspect the axle and the tire which was in plaintiff's possession. The rest of the car was in the defense's possession, and the court gathers that neither side was very cooperative in displaying those items to the other prior to depositions.

"Apparently, it took a court order to get that done.

"For that reason, a second deposition was ordered by another court—this is the deposition that retired Judge Tevrizian served as referee. Additional questions were asked at that deposition.

"Now, when the case was assigned for trial, this court has since and during the course of trial, ordered two further depositions for Mr. Marcosky.

"In addition from what the court can gather from both argument of counsel—as well as through skimming through the depositions of defense experts—defense experts had been concerned with these same areas long before the trial started; namely, accident reconstruction, speed, angle force, the loads required to break the trailing arm.

"It seems to me that defense had adequate notice. They were told in both interrogatories and in depositions—what areas Mr. Marcosky was going to testify to.

"Now, it is true that he had not performed all of his tests. He had not arrived at his ultimate opinions in any given area, but certainly it was enough to put you on notice as to what the issues were going to be, and what areas he was going to offer expert testimony on.

"So, on the issue of discovery, I think defense has been adequately protected, and that no prejudice has been shown."

Fourney commissioned at the request of Williams following the testimony of Dr. Kashar, almost a full month into the trial. The fact of inconsistency would have no different legal effect than that previously discussed in connection with the Kashar "contradictions." The propriety of the Fourney evidence deserves some analysis.

At his deposition Dr. Douglas testified that since he was not an expert on stress analysis he could not give opinions on the numerical value of the loads or stresses on the trailing arm at the time of its fracture and that he customarily relied on the test reports of stress analysts in arriving at an opinion on part failures.

While the reason is disputed,[7] Douglas, during trial, requested Dr. Fourney to perform a stress test on an exemplar trailing arm. The test was conducted and a report was provided.

At trial, consistent with his deposition testimony that he would require such an analysis before he could render an opinion, Fourney's test results were factored in and on the basis thereof he concluded that fatigue and manufacturing defects were indeed factors in the failure of the trailing arm. Having opined that the test did not involve subjective opinions, but rather factual calculations about which there could be no disagreement and on which Douglas was entitled to rely, the trial court properly allowed the reliance on the calculations,[8] after it directed Williams to produce Dr. Fourney for voir dire (relative to foundation for the test) out of the presence of the jury and after instructing the jury, sua sponte, on the treatment which they should give the test information.[9] The reason for the trial court's

---

[7] Williams contends that the test was forced by VW's ". . . sudden focus on making insufficiency of loads an issue and . . . [its] strategy of attacking Douglas' overall opinions, by exaggerating the importance of data that he did not have. . . ." That this lack of foundational information served to embarrass him before the jury.

VW contends that the test was ordered ". . . to save Plaintiff's case after Dr. Kashar had admitted in cross-examination that the inclusions he saw were, at best, only *possible*, inclusions and that his test showed that the trailing arm was in fact, as strong as Marcosky had said the product should be. . . ."

[8] See Evidence Code section 801. "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:

". . . . . . . . . . . . . . . . . . . . .

"(b) Based on matter . . . made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates. . . ."

[9] "THE COURT: Let me just caution the jury. This is not proof of what Dr. Fourney did. This is the witness' assumption that he did the following and based on that assumption the witness is going to render an opinion.

"So you will consider it like a hypothetical question. If those facts aren't proved, then you have to determine the effect of the failure, omission on the opinion itself.

"I can only assume we will get some additional evidence in the case."

permitting Douglas's reliance on Fourney's report over VW's objections that it amounted to his testifying as an expert witness in stress analysis, contrary to his deposition testimony and in violation of section 2037, is made clear in its explanation to the objector: while not himself a stress analyst, as an expert he hired a stress test and was entitled to base his opinion as a metallurgist upon it.[10] For similar reasons the court properly denied VW's motions to strike the Douglas testimony and to exclude any testimony of Douglas which relied upon Fourney. It was then directed that Fourney be made available for deposition before cross-examination, where-upon VW moved for a mistrial on the ground of "severe prejudice to make any sort of meaningful cross-examination of [the] witness . . ." and not having an opportunity to run a test and compare test results. The motion was denied, apparently upon the conclusion that VW would not be so prejudiced, considering that Fourney's foundational testimony would consist of "measurements" only, as distinguished from "opinions," and that VW's expert had conducted tests similar to Fourney's. Even without specific findings, these determinations, including those which follow (*infra*), com-pose a sufficient record to enable this court to evaluate whether the trial court properly exercised its discretion and had a valid basis for determining an absence of prejudice. (See *Gallo* v. *Peninsula Hospital* (1985) 164 Cal.App.3d 899 [211 Cal.Rptr. 27].) The sudden requirement, limited scope and familiar content of Fourney's testimony on direct examination, satisfy the provisions of Code of Civil Procedure section 2037.6.

### 3. *There Is No Prejudicial Refusal to Grant Continuance*

■ VW made a motion for a two-week continuance in order to consult an expert, selecting time based upon his understanding of how much time Dr. Fourney required to work up his test. After an inquiry directly to Dr. Fourney,[11] and apparently assuring itself that a continuance of two weeks, one week, or even three days was unnecessary, the court denied the motion,

---

[10]"THE COURT: . . . [I]n forming his opinion on a fatigue and impact loading he sent out and got a chemical test and a stress test, and he used the results of those tests on which to base his opinion.

"It appears to the court that Dr. Fourney is not rendering an opinion, but is simply making a physical test on a piece of physical evidence, and that the results of that test are being used by the expert who is in turn rendering his opinion. . . ."

[11]"THE COURT: How much time did it take you to do these tests, Doctor?

"THE WITNESS: I believe it is about eight hours . . .

"MR. KARLSONS: How much time did it take to do the calculations after that sir?

"THE WITNESS: I REALLY DON'T REMEMBER; A COUPLE OF HOURS."

setting forth its explanation and demonstrating a willingness to accommodate the defense need to deal with the witness's testimony on direct.[12]

In each instance the trial court had sufficient reasons for denying the motion to strike and the motion for continuance, meeting the requirements of *Swickard** and *Kennemur, supra,* such that its decisions should not be overturned. In *Kennemur* the appellate court approved the taking of an undisclosed witness's deposition, during plaintiff's case in chief, when specific expert opinion is first disclosed then, where only one witness is involved, the subject matter limited and the circumstances of the deposition are fair to the opposing party, specifically recommending the deposition for ". . . after court hours, thereby avoiding any disruption of the trial proceedings." (*Id.,* at p. 920.) The reasonable exercise of the trial court's discretion in denying a motion for continuance for deposition purposes was commended. For reasons previously stated, the trial court's exercise of discretion in this case is no less commendable. Its dialogue is a clear indication that the trial court had the appropriate *Kennemur* standards in mind.

The type of conduct on which the trial court justified its imposition of sanctions in the *Swickard** case does not exist here: bad faith, violations of common notions of courtesy and professionalism, tactics which are obstructive, harassing, and contrary to the spirit and intent of discovery.

*4. There Is No Prejudicial Admission of Expert Opinions About "Possible" Defects Outside Their Expertise*

█ VW's contention that the trial court committed prejudicial error by permitting plaintiff's experts to speculate about "possible" defects in areas that were outside their field of expertise and not supported by the facts, is also without merit. To sustain this position it is necessary that there be a showing that Williams's experts were not sufficiently qualified pursuant to Evidence Code section 801, subdivision (b), or that the court permitted experts to testify on areas beyond their expertise or on matters which amount to "speculation" or mere "possibilities." (See *Long* v. *Cal-Western States Life Ins. Co.* (1955) 43 Cal.2d 871 [279 P.2d 43].) An expert's opinion

---

[12]"THE COURT: We can do all kinds of things. We can order this witness to be on recall, if you want to recall him at the end of this case. That is not a problem.

"Do what you can with him. If you don't want to cross-examine him, we will delay it until later in the case. It is not something that is going to take you two weeks to prepare for. . . ."

*See Reporter's Note, *ante,* page 1258.

cannot be based on facts which find no support in the evidence or upon irrelevant and speculative matters. (2 Jefferson, Evidence Benchbook (1982) pp. 997-999; *People* v. *Beach* (1968) 263 Cal.App.2d 476, 487 [69 Cal.Rptr. 394].)

The record in this case shows that Williams's experts were carefully qualified in order to provide foundations for the expert opinions which they were expected to give on direct examination. By way of illustration, Mr. Marcosky's direct examination on his qualifications as a mechanical engineer consumed 32 pages of transcript. His voir dire by VW consumed 28 pages. He described his expertise as a mechanical engineer as ". . . a scientist, an engineer who deals in material things, mechanical things, design of structural components, mechanisms, like the automobile that we will be talking about today, getting involved in steel structures for buildings, machinery design, engine design, . . ." with a particular emphasis on automobile engineering having done work in motor vehicle accident reconstruction, failure analysis and having taught stress analysis. He succinctly explained the basic idea of his function as a reconstruction expert to be that of taking ". . . the available physical facts, . . . look at those facts, . . . the scene, and try to put together based upon . . . [his] experience and [his] education, what most *probably* occurred. . . ." (Italics added.)

VW complains that the trial court permitted Marcosky to testify that in his opinion the trailing arm contained "dirty steel," with inclusions, in its construction, thus compromising the strength of the material and leading to fatigue failure. The record clearly shows this opinion to be based on his experience in the field of failure analysis not metallurgy, as VW charges. That testimony is in line with the witness's expertise, qualifications and foundation which was laid for it. It was not speculative.

Similarly, VW complains that Marcosky should not have been permitted to testify about defects in the steering assembly because he lacked expertise in injury causation or enhancement and that his testimony did not establish a general connection between injury, or any likelihood of injury, and the defects in the steering assembly that he purported to identify. The trial court sustained VW's objection to any attempt of the witness to testify about injuries, but permitted him to ". . . reconstruct the movement of the automobile in relationship to the movement of the human body, including reference to cosmetic material stains upon the steering wheel assembly.[13]

---

[13]"Q. [BY MR. GREENE]: Give us your accident reconstruction here of Kim Williams' motion as this accident sequence was going on . . .

"A: Miss Williams is sitting in the driver's seat of the vehicle with her hands on the

Marcosky testified that the energy absorbing aspects of the steering assembly mechanism did not work as they were supposed to. The trial court allowed no reference to the "forces" at play other than the failure of the steering wheel and its preventing the forward movement of Williams's body. Both items are matters within his expertise in automotive engineering, accident reconstruction, failure analysis, etc. As pointed out by the court below, this line of questions did not call for an opinion about "results," such as how much force or what injuries might have been sustained, but rather, "the directional movement of the body . . .", without regard to such factors.

It seems hardly necessary for Williams to have proved by Marcosky and other experts, as VW would apparently require, that when a steering wheel strikes a person in the face it either causes or enhances her injuries there. That is the type of conclusion which a jury might reach without expert guidance. (*Kennemur, supra,* 133 Cal.App.3d 907, 926; see also Evid. Code, § 801, subd. (a).)

VW has even less reason to complain about Dr. Kashar's testimony as an "expert" in the area of quality control. He had testified at his deposition that he was not an expert in that field. When the question of his qualifications was before the trial court, the defense, making reference to his statement of lack of qualifications in deposition, objected. The objection was sustained with the suggestion that cross-examination of the witness should be considered by VW and that Williams should give more thought and effort to establishing a foundation for the quality control opinions. Although several foundational questions were asked on this occasion, the record demonstrates that the question arose subsequently only upon VW's initiative during cross-examination and produced testimony showing lack of qualifications consistent with the deposition testimony. In other words, the cross-examination appears to have been completely successful on the issue.[14] VW ungratefully concludes that it was harmed. Understandably, no other showing is made.

steering wheel. And as the vehicle exits the roadway she experiences some deceleration as a result of the impact with the curb.

"In looking at the vehicle . . . we find what we call witness mark, where a deposit, some contact has been made between the occupant and the steering wheel assembly.

"And that witness mark is the cosmetic material that women use on the trim section around the horn button, as well as a stain on the spoke. And if you were to take that and just put your face in here like this [indicating], that matches up with the area where women use cosmetics. . . ."

[14]"Q. [By VW]: Do you have any evidence, sir, that Volkswagen doesn't have this good program [superquality control procedure]?

"A: No, I don't know anything about Volkswagen quality control program, in those terms.

"Q: Do you have any opinion here that the quality control procedures at VW somehow fell below the level of accepted practice for the auto industry?

"A: I wouldn't have an opinion one way or the other. I don't know what the accepted practice is in general."

The essence of VW's quarrel is how the jury dealt with the evidence in terms of whom it believed, couched in terms that it was ". . . befuddled and confused by the non-stop torrent of unfounded expert testimony that rained down during the six-week long presentation of Plaintiff's case." Obviously, VW would have preferred that the jury give its experts the nod. But credibility of expert witnesses is a matter for the jury after proper instructions from the court. (See BAJIs, *infra*).

The trial court properly instructed the jury, using BAJI Nos. 2.40 "Expert Testimony"—"Qualifications of Expert"; 2.41, "Weighing Conflicting Expert Testimony"; 2.01, "Weighing Conflicting Testimony"; and 2.20, "Credibility of Witness and Hypothetical Questions." As a matter of fact, VW specifically requested that the jury evaluate, as a question of fact, the qualifications and credibility of the experts.

A party who requests that an issue be submitted to the jury as a question of fact is bound by the jury's determination. As stated by the California Supreme Court, "The request that the jury be instructed as requested by defendants necessarily constituted a consent to submission of the issue as a question of fact to be resolved by the jury. . . . A party cannot request that an issue be submitted to a jury . . . and on review escape the consequences." (*Cockrell* v. *Title Ins. & Trust Co.* (1954) 42 Cal.2d 284, 288 [267 P.2d 16].) VW is bound to its submission and Williams is bound to the presumption that the jury believed her experts over those of VW. (*Naples Restaurant, Inc.* v. *Coberly Ford* (1968) 259 Cal.App.2d 881 [66 Cal.Rptr. 835].)

Having discussed the admissibility of the Douglas/Fourney testimony *supra* (pp. 1259-1261), we can find no error of the trial court admitting expert testimony which was either speculative or beyond their fields of expertise.

II. *There Is No Error in Finding Liability for Negligent Manufacture and Breach of Warranty After Special Finding of No Design Defect*

Not surprisingly VWAG contends that Dr. Kashar's testimony should have been excluded and since manufacturing defects were based solely upon his testimony, there is insufficient evidence on which to base a finding of negligence. The jury specifically found VWAG negligent, while finding VWOA and Marina not negligent but still liable on the basis of breach of implied warranties. VWAG objects to the negligence finding on the ground that the jury found *no* design defects and since there was insufficient evidence

of manufacturing defects there were simply no defects in the car and therefore, the verdict was improper.

 Contrary to VWAG's contention, the record amply shows evidence of manufacturing defects on which the jury could have based its findings of negligence. Although Williams variously referred to "design" and "manufacturing" defects, it is clear that substantial evidence had to do with manufacturing defects. The best illustration occurred during the direct examination of Dr. Kashar by counsel for Williams.

"Q. [BY MR. GREENE]: In your opinion, sir, did the defects in manufacture and design play a part in the fracture of this particular trailing arm in the Williams case?

"A: Yes, they did."

One exhibit (106 B) even bears a note to the effect.[15] Having previously discussed the admissibility of the Kashar testimony (ante, p. 1258) an examination of its sufficiency on the issue of negligence during manufacture is in order. He testified, inter alia, that he assessed the treatment aspect of the metal that was put into the Dasher; examined the parts from it; examined certain photographs of its parts; noticed certain "inequalities" in the metal; tested the strength of the trailing arm; explained parts of the manufacturing process; identified residual stress as a result of the manufacturing process; the product was not made fail safe for humans; proper material for the part bends before it breaks; he found an agglomeration of "inclusions" on the fracture area of the trailing arm which weakened it; they amounted to a defect in manufacture; and played a part in the fracture of the trailing arm.

Even VWAG recognized the significance of the evidence and requested jury instructions which included negligence in manufacturing. The law of this state requires that the evidence be viewed, on appeal, in a light most favorable to Williams, the prevailing party on the issue and all conflicts and credibility issues resolved in her favor. (*Munoz* v. *Olin* (1979) 24 Cal.3d 629, 635-36 [156 Cal.Rptr. 727, 596 P.2d 1143]; *Aceves* v. *Regal Brewing Co.* (1979) 24 Cal.3d 502, 507 [156 Cal.Rptr. 41, 595 P.2d 619]; *Horn* v. *General Motors Corp.* (1976) 17 Cal.3d 359, 367 [131 Cal.Rptr. 78, 551 P.2d 398]; *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-26 [101 Cal.Rptr. 568, 496 P.2d 480].)

---

[15] "MR. GREENE: Now for the record, Dr. Kashar has written 'defect in manufacture. One, inclusions in steel at fracture site reduce the strength of the steel.'"

The instruction regarding products liability, negligence and duty of manufacturer was given in the conjunctive, including the issues of design *and* manufacture duties.[16] Therefore, the jury's finding of "no" on *design* defect of the trailing arm and the steering system is not the same as finding no *manufacturing* defects and is not inconsistent with a determination that the product was negligently manufactured, resulting in damages to Williams. The instruction and the finding are, in fact, completely consistent. That a "No Manufacturing Defect" special verdict form was not provided the jury did not impair its ability to affirmatively determine VWAG's negligent manufacture. The theory being applicable, supported by sufficient evidence and consistent with the verdict (and findings), warrants affirmation of the judgment against VWAG. (*Khanna* v. *Microdata Corp.* (1985) 170 Cal.App.3d 250 [215 Cal.Rptr. 860].)

III. *The Motion for Judgment Notwithstanding the Verdict Made on Behalf of VW Was Properly Denied*

Privity of contract between Williams, VWOA, Marina and VWAG is not required under the facts of this case. Williams suffered physical injuries from the use of a product marketed by VW, therefore the rules of product liability pertain, including certain implied warranties of suitability, not the rules of contract which apply to nonpersonal injury sales warranties. The jury findings of negligence by VWAG, no design defects and no negligence by VWOA and Marina are not inconsistent determinations.

VW's premise that a finding of no design defect equals a finding of no defect at all has led them, hoisted on their own staff, to the tortured conclusion that the issue of strict liability was decided in their favor. An examination of the verdict and special findings reveals no basis for such a conclusion. The jury was instructed on the concept of strict liability and presumably applied it.

VW's authority for denying the benefits of the law of strict liability and implied warranties to Williams are inapposite; they apply to actions on sales contracts and require privity as a basis for recovery in actions for breach of warranty. (See 2 Witkin, Summary of Cal. Law (8th ed. 1973) pp. 1152-1153; *Burr* v. *Sherwin Williams Co.* (1954) 42 Cal.2d 682 [268 P.2d 1041]; [goods damaged corp.]; *Odell* v. *Frueh* (1956) 146 Cal.App.2d 504 [304

---

[16]"The manufacturer of a product that is reasonably certain to be dangerous if negligently made, has a duty to exercise reasonable care in the [design] [manufacture] [testing and inspection] of the product [and in the testing and inspection of any component parts made by another] so that the product may be safely used in a manner and for a purpose for which it was made. [¶] A failure to fulfill that duty is negligence."

P.2d 45, 76 A.L.R.2d 345] [goods damaged floor]; *Thomas* v. *Olin Mathieson Chem. Corp.* (1967) 255 Cal.App.2d 806 [63 Cal.Rptr. 454] [economic loss only]; *Anthony* v. *Kelsey-Hayes Co.* (1972) 25 Cal.App.3d 442 [102 Cal.Rptr. 113] [economic loss only]; *Rodrigues* v. *Campbell Industries* (1978) 87 Cal.App.3d 494 [151 Cal.Rptr. 90] [economic loss only].)

A long line of California cases upholds Williams's right to recover in this case, fully exempting her from a need to rely on either a theory of contract or privity. The Supreme Court held, In *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], that: "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being."

Modernly, that liability, though historically grounded on express or implied warranty, is based not on an agreement, which would make privity relevant, but is imposed by law.

These rules place responsibility for defects, *whether negligently or non-negligently caused,* on the manufacturer. (Italics added.) (*Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256 [37 Cal.Rptr. 896, 391 P.2d 168].)

A retailer (Marina), and anyone else engaged in distributing the product (VWOA), is strictly liable in tort for personal injuries caused by its defects.

So foreign is the principle of privity of contract to the law of strict liability today, that the California Supreme Court has extended the remedies of strict liability even to a third person bystander, injured as a result of the defective product. (*Elmore* v. *American Motors Corp.* (1969) 70 Cal.2d 578 [75 Cal.Rptr. 652, 451 P.2d 84, 33 A.L.R.3d 406].)

 Williams sufficiently established her case by proving the product defect and that the defect caused her injuries. (*Grinnell* v. *Charles Pfizer & Co.* (1969) 274 Cal.App.2d 424, 435 [79 Cal.Rptr. 369].) Both the defect and the cause of injury may be proved by circumstantial evidence or expert testimony. (*Id.,* citing *Vandermark, supra.*)

It is reasonable to conclude from the verdict and findings that the jury, upon determining that VWAG was negligent in the manufacture of the Williams car, also determined that it was strictly liable and extended such strict liability to VWOA and Marina by *including them in the breach of* warranty findings. Thus the general verdict and special findings are consistent between themselves and with the instructions on product strict liability in

tort (see BAJI No. 9.00), Liability of Persons in Chain of Distribution, and Implied Warranty of Fitness, to the effect that "[t]he manufacturer, distributor or importer and dealer . . ." are liable for injuries caused by the defect.

■ Nor does the Song-Beverly Consumer Warranty Act, Civil Code section 1795.5 serve to impair Williams's remedies under strict liability/implied warranty theory. The section simply does not apply. It is clear on its face that the application is limited to sale contracts in general and only those involving express warranties in particular. Each paragraph is carefully written in terms of such limitation.[17]

We are aware of no authority for the proposition that this "consumer" protection legislation was intended as an impairment or restriction on personal injury product liability causes of action, nor does VW cite any.

IV. *Counsel Did Not Engage in Conduct Warranting a Reversal*

■ Finally, while VW set forth several instances of counsel conduct, contending that it was sufficiently prejudicial to warrant a reversal on appeal, such a charge is not supported by the record. VW cites on this appeal five instances of counsel "misconduct" in argument to the jury, ranging from ". . . arguing facts not in evidence" to ". . . improperly [arguing] that there were deficiencies in VW's methods of quality control." The record reveals not one single objection during argument. Instead it shows a request for a "curative instruction" regarding matters unrelated to those cited here.[18] Cases cited by VW in support of such relief are easily distinguishable.

In *Malkasian* v. *Irwin* (1964) 61 Cal.2d 738 [40 Cal.Rptr. 78, 394 P.2d 822], the trial court was affirmed in its order *granting* a motion for a new

---

[17]By way of illustration, see the introductory paragraph of section 1795.5 of the Song-Beverly Consumer Warranty Act: "Notwithstanding the provisions of subdivision (a) of Section 1791 defining consumer goods to mean 'new' goods, the obligation of a distributor or retail seller of used consumer goods in a sale in which an *express warranty* is given shall be the same as that imposed on manufacturers. . . ." (Italics added.)

[18]"MR. KARLSONS: . . . First, with regards to counsel's closing argument. I request some kind of curative instruction for the following misconduct in closing argument of counsel.

"First, reference to again discovery orders, that we had access to all of the evidence, equal access with him; and that the court controls throughout all these proceedings; suggesting the secretion of the wheel was not something that took place.

"Second, making reference to Dr. Bercel's report, saying, 'it is here', when it is not here. It is not in evidence. We specifically addressed that before.

"Mr. Bohnsak, misstatement that Volkswagen before the lawsuit was filed when he was looking for the car—total out of range. The evidence on Mr. Bohnsak was he sold the car in February, the year after service was made of the complaint. . . ."

trial on the basis of counsel misconduct after determining and expressing the opinion that there was a resulting "miscarriage of justice." The appellate court emphasized that such a determination is completely within the trial court's discretion and that its action will not be disturbed[19] ". . . unless a manifest and unmistakable abuse of discretion appears." (*Id.*, at p. 747.) In the case at bench, the trial court obviously made a determination that the complained of conduct did not have such an effect. Under the same rule, on appeal, no abuse appears here.

In *Simmons* v. *Southern Pac. Transportation Co.* (1976) 62 Cal.App.3d 341 [133 Cal.Rptr. 42], the trial court was reversed because the prejudicial effect of attorney conduct was clear from a ". . . 'view of the overall record, taking into account such factors, inter alia, as the nature and seriousness of the remarks and misconduct, the general atmosphere, including the judge's control of the trial, the likelihood of prejudicing the jury . . .,'" etc. The record showed a "campaign of hate, vilification and subterfuge for the sole purpose of prejudicing the jury . . ." (*id.*, p. 351), setting out some 25 examples of egregiousness, including making the statement: ". . . [T]hey don't care . . . the Vice President . . . tells you, 'No, I don't think pedestrians deserve that kind of protection . . .' Let the pedestrian be damned . . . ." (*Id.*) VW's list[20] falls far short, quantitatively and qualitatively, of its burden of showing misconduct which threatened or interfered with a fair trial. To the contrary, it appears that the court's instructions on statements of counsel—insinuations or questions, failure to produce available stronger evidence, failure to deny or explain adverse evidence, and respective duties of judge and jury et al., were sufficiently directive to cure any apparent transgression about which VW complains.

In conclusion, since no prejudicial error appears in the record, the judgment is affirmed.

Danielson, Acting P. J., and Arabian, J., concurred.

Petitions for a rehearing were denied June 9, 1986, and appellants' petitions for review by the Supreme Court were denied August 14, 1986.

---

[19]Common sense dictates the rule. It is the trial judge who is at the best vantage point to surveil the grenades, the darts, the slings and arrows of outrageous forensic conduct, rather than the reviewer who, with the delayed, deliberate detachment of a coroner, examines the cold body of the record only after the warm life of trial has expired and its rattlings have ceased.

[20]The items consist of mistatements or insinuations of fact and "misinstructing" the jury.